**K & S PARTNERSHIP, et al., Plaintiffs,**

v.

**CONTINENTAL BANK, N.A., etc., Defendant.**

No. CV 84–0–626.

United States District Court, D. Nebraska.

Sept. 18, 1989.

Thomas H. Dahlk, Omaha, Neb., for plaintiffs.

Richard H. Ferri, Chicago, Ill., Pamela Black, Omaha, Neb., for defendant.

## MEMORANDUM AND ORDER

RICHARD G. KOPF, United States Magistrate.

Continental Bank, N.A. ("Continental") moves for judgment notwithstanding the jury verdict (filing 298). The plaintiffs move for attorneys' fees (filing 297) on the basis that they recovered pursuant to a jury verdict on a civil RICO claim, and thus are entitled to attorneys' fees. Since I will grant, in part, the motion for judgment notwithstanding the verdict as that motion regards plaintiffs' recovery on the RICO claim, I will deny the plaintiffs' motion for attorneys' fees as moot.

This case involved an alleged securities fraud. Plaintiffs contended that Continental assisted certain promoters in oil and gas limited partnerships in creating a false track record, thereby luring the plaintiff investors into investing with the promoters of the oil and gas limited partnerships. The jury returned a verdict in favor of all plaintiffs against Continental on all counts of the complaint, including a RICO count.

## I. J.N.O.V.

### A. Introduction

Continental claims the jury verdict should be overturned because:

(1) Plaintiffs failed to prove their damages;

(2) Continental cannot be held vicariously liable for alleged acts of its employees under RICO;

(3) Plaintiffs failed to demonstrate a multiple scheme necessary to support a RICO claim;

(4) Plaintiffs failed to establish transaction causation or proximate cause;

(5) Plaintiffs did not justifiably rely on the alleged misrepresentations.

Continental's motion will be granted in part regarding the RICO claim, because on the trial record as a matter of law Continental did not directly violate the law, and

the acts of its employees or agents cannot be imputed to Continental since it was not the corporate policy of Continental to seek "loan growth at any price." Otherwise, the motion for judgment notwithstanding the verdict should be denied.

### B. Standard of Review

■ In deciding whether to grant the motion for judgment notwithstanding the verdict, the court, sensitive to the constitutional right to trial by jury, may grant the motion only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. 5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 50.07[2] (2nd ed. 1989). In considering the motion, the court must view the evidence in the light and with all reasonable inferences most favorable to the party who secured the verdict. *Id.* I have followed these principles in this case.

### C. Failure to Move for Directed Verdict

■ Federal Rule of Civil Procedure 50(b) has been construed to require that a party who moves for judgment notwithstanding the verdict must have also moved for a directed verdict at the close of all of the evidence. This means that normally when a defendant, after moving for a directed verdict at the conclusion of plaintiffs' case, fails to renew the motion at the close of all of the evidence, defendant is deemed to have waived the defendant's right to judgment notwithstanding the verdict. *Myers v. Norfolk Livestock Market, Inc.*, 696 F.2d 555, 558 (8th Cir.1982). However, in some circumstances, the courts have excused noncompliance with this requirement. *Id.* (citing, among other cases, *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 825 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979)). This is a case where noncompliance with the normal requirement should be excused.

■ Immediately before counsel argued the case to the jury, certain "housekeeping" matters were taken up outside the presence of the jury. Plaintiff had rested, but defendant had not done so formally.

The defendant offered certain exhibits, the court dealt with the offer, and defendant, although still not formally resting, renewed a previous motion for directed verdict saying: "The only thing further is that we would—prior to the jury coming back in, would renew our motion for directed verdict." Plaintiffs then offered a chart so the chart could be used by plaintiffs in their counsels' argument before the jury. The chart was received. At that point the jury was brought back into the courtroom.

Counsel for the defendant then read a summary of tax deductions taken by individual plaintiffs arising out of their investments in the securities at issue. Essentially, what took place in front of the jury was the publication of a summary of previously admitted evidence. Defendant rested. Defendant did not renew the motion for directed verdict in front of the jury. Plaintiff offered no rebuttal. Closing argument began.

Essentially, what took place after defendant renewed its motion for directed verdict was (1) outside of the presence of the jury plaintiffs offered a chart so it could be used in argument by plaintiffs in front of the jury, and (2) defendant read into the record without objection and before the jury a summary of certain tax deductions taken by the plaintiffs and with which the parties had spent a considerable period of time dealing during the trial as each plaintiff testified.

I firmly understood, and I believe that all counsel did also, that the procedure used by defendant to summarize the tax return information was intended only to publish in the most expedient and least time consuming manner complex evidence essentially already in the record. I had ruled that the tax returns themselves would not go to the jury. Although I did not explicitly tell counsel for defendant that he need not renew the motion after his summary of the tax return information, that was certainly my understanding and apparently defense counsel's as well. I was not in any way misled by the actions taken by the defendant, and plaintiffs likewise make no claim that they were misled.

There are two purposes for the requirement that one must move for a directed verdict at the close of all of the evidence in order later to be permitted to move for judgment notwithstanding the verdict. 5A J. Moore & J. Lucas, *supra*, ¶ 50.08. The first purpose is to ensure that the court examines the sufficiency of all of the evidence as a matter of law before the jury renders its judgment on the facts, so that the constitutional right to a jury trial on the facts is preserved. *Id.* In other words, the right to a jury trial should not be denied until the court knows all of the evidence and can state as a matter of law that the evidence is insufficient. The less esoteric, and more practical, reason for the rule is to avoid trapping the unwary; that is, at the time the motion for directed verdict is made the party against whom the motion is made can still cure the alleged deficiency. *Id.* Thus, the rule seeks to promote justice and the avoidance of tactical victories at the expense of justice.

In this case, since no one was misled or prejudiced, the court tacitly condoned the procedure, no new evidence was presented, and the evidence presented was brief, the failure to renew the motion for directed verdict is not fatal. *Halsell v. Kimberly–Clark,* 683 F.2d 285, 294 (8th Cir.1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983); *Ohio–Sealy Mattress Mfg. Co.,* 585 F.2d at 824–26; *Pittsburg–Des Moines Steel v. Brookhaven Manor Water Co.,* 532 F.2d 572, 576 (7th Cir.1976); 5A J. Moore & J. Lucas, *supra,* ¶ 50.08.

### D. Vicarious Liability Under RICO

■ Continental argues that the evidence as a matter of law failed to establish any reasonable inference that the alleged wrongful acts of its employees, or those acting in union with those employees, became the policy of Continental. If it was not the corporate policy of Continental to further the alleged wrongful acts of its employees, and those acting in concert with its employees, then Continental argues that as a matter of law it cannot be held vicariously liable under RICO. I agree.

This case was at its core a securities fraud case. Among other things, the plaintiffs contended that Eagle Petroleum Corporation ("Eagle"), Wesley Markle and Terry Stanhagen created a false track record of success with regard to limited partnerships, which had been formed to explore for oil and gas, by two means: (1) Eagle, Markle and Stanhagen created a false track record of success by representing that drilling loans obtained in earlier programs had been replaced by production loans when at the same time those production loans were based upon insufficient oil and gas reserves to justify the loans; and (2) Eagle, Markle and Stanhagen misrepresented their track record by concealing the fact that two of its earlier programs, Kingfisher and Equity, had not found sufficient quantities of oil and gas to be successful and those programs were "repurchased" from the investors without disclosure of those facts to later investors (Filing 276, Instruction 24).

At the heart of this case were a series of banking transactions spanning a number of years between Continental and Penn Square Bank ("Penn Square"). Plaintiffs sought to prove a conspiracy whereby Continental and Penn Square entered into an unlawful agreement to defraud plaintiffs and other investors in syndicated oil and gas programs by facilitating the sale of Eagle securities, or other securities of other syndicated deals, by creating a false track record respecting the past performance of the oil and gas syndicator (Filing 276, Instruction 32). Plaintiffs sought also to prove that Continental substantially assisted Eagle, Markle and Stanhagen in the sale of securities by participating in the making of production loans (Filing 276, Instruction 28).

First, it was claimed that Penn Square would make a "drilling" loan to the Eagle partnerships, and other oil and gas promoters (secured by letters of credit furnished at the request of, and on behalf of, the investors by their personal bank (Filing 276, Instruction 32).[1] After Penn Square

---

**1.** A drilling loan was a loan made to finance the     finding of oil and gas. If oil or gas was found

made the drilling fund loan, plaintiffs contended that Penn Square would then make a production loan to Eagle (or other oil and gas promoters) thereby causing the release of letters of credit, with Penn Square either: knowing that the petroleum reserves were insufficient to repay the production loan or recklessly disregarding the need to ascertain whether the petroleum reserves were sufficient to repay the production loan (Filing 276, Instruction 32).[2]

Continental's part in these transactions was said to be that of a "participant," meaning, under normal circumstances, that a large bank, like Continental, would purchase all or a portion of the production loan from Penn Square, which was a much smaller bank. However, plaintiffs contended that the circumstances were not normal. Plaintiffs contended that the "participation" of Continental was with knowledge that the oil and gas reserves were insufficient to pay the production loans, or that Continental recklessly disregarded the need to ascertain whether the reserves were sufficient.

In essence, plaintiffs contended that Penn Square and Continental helped Markle, Stanhagen and Eagle engage in a "pyramid" scheme. As long as the banks would make production loans, oil and gas promoters could sell their securities regardless of the sufficiency of the oil and gas used to collateralize the production loans. The benefit to the banks would be large interest bearing loans, and, despite the failure due to lack of oil and gas reserves of

certain production loans, if enough loans were made the profits to the banks would exceed any losses which might occasionally occur. As long as the banks would make production loans, Markle, Stanhagen and Eagle had a good "track record" to point to in order to induce others to invest. As long as investors had no cash in the limited partnership, as where letters of credit were used to finance the investment, if production loans were made, causing the release of the letters of credit, investors had nothing to lose and could make an investment sometimes without paying any money. Ultimately, Penn Square was closed by federal regulators, outstanding letters of credit were called because no one would make production loans, and these plaintiffs, along with others, sued.

Plaintiffs contended that Continental violated sections 1962(c) and (d) of RICO for essentially the same reasons that Continental was guilty of being an aider and abettor of the securities fraud of Markle, Stanhagen, and Eagle, and for essentially the same reason that Continental was a co-conspirator of Penn Square (Filing 276, Instructions 39 and 49). It is at this juncture that Continental makes a compelling argument—there was never any evidence from which a jury could reasonably infer that Continental adopted as a matter of policy the acts of its employees in dealing with Penn Square. Accordingly, Continental argues that the RICO judgment must be overturned.[3]

---

in sufficient quantities, the drilling fund loan was replaced with a longer term loan, known as a production loan, which production loan was collateralized by the oil and gas reserves. Letters of credit would pay the drilling fund loan if the drilling fund loan was called by Penn Square in the event that no long term loan could be made to the oil and gas promoter because no oil and gas were found. If oil and gas were found, the letters of credit were normally released in favor of the long term production loan. In this way investors could make highly leveraged investments in oil and gas syndicated investments with little or no "up front" cash.

**2.** Once the production loans were made they were ostensibly collateralized by the oil and gas reserves. When a production loan was made

the letter of credit would normally be returned and the investor was no longer at risk to have to pay the drilling fund loan which was refinanced by the production loan.

**3.** At oral argument Continental agreed that plaintiffs could prove a civil securities fraud conspiracy or a civil aiding and abetting a primary securities fraud violation on the part of a corporation without establishing that the corporate policy of the defendant was to commit the fraud. In other words, Continental argued that there was a level of "knowledge" or "scienter" required in proof of a RICO claim which was not required in proof of the other claims. Continental contends that proof of a RICO claim requires evidence of a "knowing and intentional participation in the criminal scheme at a level at which it can be said that the criminal activity

### (1) Theory

█ The cases make clear that before RICO liability may be imposed it must be proven that it was the corporate policy which created the scheme or senior corporate management which implemented the scheme. *See, e.g., D & S Auto Parts, Inc. v. Schwartz,* 838 F.2d 964, 966–68 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988); *Schofield v. First Commodity Corp.,* 793 F.2d 28, 32–33 (1st Cir.1986); *Gruber v. Prudential–Bache Sec., Inc.,* 679 F.Supp. 165, 181 (D.Conn.1987); *O'Brien v. Dean Witter Reynolds, Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 91,509, at 91,561, 1984 WL 608 (D.Ariz. Mar. 26, 1984) (LEXIS, Fedsec library, Courts file); *Dakis v. Chapman,* 574 F.Supp. 757, 759–60 (N.D.Cal.1983). It is important to understand that the policies behind vicarious liability and RICO are different. In the normal civil context, vicarious liability is used to shift the economic costs of the damage from the innocent third party to the producer of the product in order that the producer internalizes the costs, passes those costs along to the consumer, and thereby is placed in a competitive disadvantage when competing against others who produce better quality goods at lower costs. In such a situation a corporation has an incentive to lower its costs by dealing more effectively with its employees. The intent of RICO, however, is to force the corrupt business from the marketplace altogether. Thus, it makes little sense to impose RICO treble damage liability upon an otherwise legitimate entity unless it is shown that the corporate policy was to violate RICO in the first case. Thus it has been said that:

> Imposition of liability following direct corporate responsibility for the predicate acts and the RICO violation is also consistent with the policies behind the RICO statute. The corporation with direct responsibility can be penalized for its predicate violations and forced to compensate the injured parties for the harms it caused. Under the RICO statute, the corporation can be undercut financially through forfeitures and treble damages or directly enjoined from further business practice. Such penalties are appropriate to a corporation conducting a business enterprise through a pattern of racketeering activity.
>
> Holding a corporation vicariously liable for the commission of predicate acts by its employees advances the policies behind vicarious liability, but is inconsistent with the goals of civil RICO. Under vicarious liability, the corporation, although not directly responsible for the harmful acts, is forced to compensate innocent third parties. It internalizes the costs of its employees' misdeeds as a cost of doing business and passes the expense along to the public in the price of its product or service. The corporation is encouraged to deter future violations and to reduce these costs, thereby reducing the cost of its product and gaining a market advantage. In contrast, civil RICO was designed to wage economic war on organized crime. Its remedies, notably forfeiture and treble damages, *were intended to force the corrupt business from the marketplace. Even its civil remedies were designed not merely to compensate, but to enlist private aid in the attack on organized crime.*

Note, *Judicial Efforts to Redirect an Errant Statute: Civil RICO and the Misapplication of Vicarious Corporate Liability,* 65 B.U.L.Rev. 561, 602 (1985) (footnotes omitted) (emphasis added).

The United States Court of Appeals for the Eighth Circuit has recognized in the RICO context that something more than evidence sufficient to prove vicarious liability is required to prove a RICO claim. *Luthi v. Tonka Corp.,* 815 F.2d 1229, 1230 (8th Cir.1987). In *Luthi,* plaintiffs' contended that Tonka should be held liable because its chief financial officer caused

---

constitutes corporate policy." Memorandum of Law in Support of Defendant's Motion for Judgment Notwithstanding the Verdict at 19 (footnote omitted). Accordingly, Continental conceded at oral argument that a finding for it on the motion for judgment notwithstanding the verdict regarding the RICO claim would not as a consequence require a finding for it on the motion for judgment notwithstanding the verdict on the other claims.

plaintiffs' financial loss by fraudulent acts relating to a purchase of various corporations owned by plaintiffs. Liability was asserted under 18 U.S.C. § 1962(c) of RICO. *Id.* at 1229.

Mr. and Mrs. Luthi owned the stock of two corporations, which I shall call A and B. They sold their stock in A and B to a corporation I shall call C. The sale was for a relatively small amount of cash up front, with a note for the balance. Prior to the purchase of the stock, Tonka had invested in a corporation which I shall call Corporation D. That investment was made at the direction of the chief financial officer of Tonka. Corporation D controlled Corporation C and both those corporations were in turn controlled by Tonka and its chief financial officer. Corporation C had been established solely for the purpose of acquiring the stock of Corporations A and B. *Id.*

Mr. and Mrs. Luthi brought suit after Corporation C defaulted. They asserted a claim against Tonka exclusively under RICO. After a pretrial dispositive motion had been granted, Judge Bright wrote the panel opinion which concluded that RICO did not apply because the doctrine of respondeat superior—one who is not at fault may be held vicariously liable for the wrongdoings of another—is contrary to the purposes of RICO. *Id.* at 1229. Accordingly, the court concluded that the trial court properly dismissed the complaint of Mr. and Mrs. Luthi. *Id.* at 1230.

While *Luthi* may be read by plaintiffs and defendant in this case in slightly different ways, what is absolutely clear about *Luthi* is that *something more than vicarious liability must exist to charge a corporation with the acts of its employees under 18 U.S.C. § 1962(c) of RICO.*[4]

Plaintiffs in their brief essentially concede the point that something more than vicarious liability is required to impose RICO liability. Plaintiffs argue in their brief:

> Unlike *Luthi*, the Plaintiffs in this case did not seek damages *solely* on the basis of vicarious liability. The Plaintiffs sought and introduced evidence from which the jury could reasonably conclude that Lytle and other Continental employees served the corporate policies of Continental in transacting business with Penn Square Bank. *The evidence introduced at trial overwhelmingly supported the conclusion that John Lytle's conduct furthered the corporate policy goals of Continental.*

Plaintiffs' Memorandum of Law In Opposition to Defendant's Motion For Judgment Notwithstanding the Verdict at 14 (emphasis added).

■ It is precisely because the evidence at trial establishes as a matter of law that the activities of Continental's employees *did not* further the corporate policy *goals* of Continental that judgment notwithstanding the verdict must be granted on the RICO claim.

### (2) The "Tone Report"

The failure of Penn Square touched off one of the most significant banking failures in the history of this country. In effect, Penn Square, a relatively small Oklahoma bank, caused, or substantially contributed to, the failure of Continental, a large international money center bank.

As a result of the collapse of Penn Square and the impact upon Continental of Penn Square's failure, various stockholder suits were filed against Continental. As a consequence of these suits, the board of directors of Continental created what became known as the "Tone committee." This committee prepared what became known as the "Tone report" officially known as the Report of the Special Litiga-

---

4. Plaintiffs also sued under a RICO conspiracy theory alleging a conspiracy to violate 18 U.S.C. § 1962(d). There seems no doubt that if something more than a vicarious liability doctrine is necessary to charge a corporation under § 1962(c), then the same standard applies to § 1962(d). Plaintiffs do not contend otherwise.

This is not necessarily true under § 1962(a). *Cf. Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1306–07 (7th Cir.1987). Among other things, § 1962(a) prohibits a person from investing monies received from a pattern of racketeering activity in an "enterprise" engaged in interstate commerce. This is not a § 1962(a) case.

tion Committee of the Board of Directors of Continental Illinois Corporation (Exhibit 90).

The "Tone report," prepared with the assistance of a former federal judge, sought to set forth the advice of a special litigation committee of the board of directors as to the position the board should take in the exercise of its fiduciary duty to stockholders regarding the pending derivative law suits. Over vigorous objection in this case by Continental, the "Tone report" was received in evidence in a redacted form. The "Tone report" is an objective, highly critical, analysis of the policies of Continental as well as the actions taken by employees of Continental when dealing with oil and gas credits.[5]

The "Tone report" (Exhibit 90), as well as the deposition testimony of former employees of Continental and Penn Square (Exhibits B through J) failed to establish as a matter of law that Continental or its senior management implemented a policy to increase the dollar volume of its loan portfolio even if that required a reduction in the quality of its loan portfolio. It was the contention of plaintiffs in this case that Continental engaged in a "loan growth at any price" policy. The evidence failed as a matter of law to establish that contention.

### (3) The "Black Hats"

So as not to be misunderstood, there is no question but that certain employees of Continental were negligent. Indeed, in ringing terms, the special litigation committee of Continental deplored what happened at Penn Square, and found negligent the actions of three individuals who dealt with, or were otherwise responsible for loans regarding, Penn Square.

For example, the "Tone report" concluded that the relationship between Continental and Penn Square was negligently mishandled by Messrs. Lytle, Redding, and Bergman, who were employees of Continental. (Exhibit 90, 28–29). The Tone committee found:

In general, there is substantial evidence that loans were disbursed without the approval of officers having the requisite lending authority; that the creditworthiness of borrowers was not sufficiently checked; that loans secured by reserves were disbursed without confirmation by the Bank's engineers of the value of the reserves; that loans which could not be justified by proven reserves were approved through the use of additional types of collateral which were insufficient; that in a number of instances security interests were not perfected; that at periodic intervals, Lytle caused the Bank to purchase groups of Penn Square participations without proper credit investigation, to relieve Penn Square's recurrent "liquidity crunches"; that Lytle tolerated improper actions by Bill G. Patterson, Executive Vice President of Penn Square, such as filling out the Bank's CRF forms for a loan or deceiving a loan officer into believing that Lytle had approved a loan when he had not done so; that loans were disbursed without preparation of notesheets or furnishing of sufficient data to permit them to be rated; that there were severe problems of lack of loan and collateral documentation and past due payments in connection with Penn Square loans; that the past due notices and exception reports generated as a result of these deficiencies were largely ignored and, in any event, never cleared up by Lytle; and that Redding (whose office was adjacent to Lytle's) had knowledge of or at least warning about many of these matters and took no effective action to correct them.

(Exhibit 90, 28–29).

Specifically with regard to Mr. Lytle, the Tone committee report found:

Mr. Lytle was the Vice President in charge of Mid–Continent Division during the period in which the Penn Square participations increased from $200 million to over $1 billion and personally was in-

---

**5.** Plaintiffs described the Tone report as having "inherent trustworthiness." Memorandum in Opposition to Defendant's Motion in Limine at 17. Indeed, outside directors were dismissed as defendants as a result of the report. *In re Continental Ill.Sec.Litig.*, 732 F.2d 1302, 1304–06 (7th Cir.1983).

volved in the making and renewal of all or virtually all of these loans. He personally was responsible for what occurred in his Division with respect to Penn Square transactions. There is substantial evidence that would support a finding that the improper credit practices and failures to follow Bank procedures described in Section III, A, at pp. 27–29, *supra*, occurred and that Lytle was responsible for those practices and failures.

The evidence in support of the claim of negligence against Mr. Lytle is clearly sufficient to go to the jury, and the Corporation's interest would be served by continued prosecution of that claim.

(Exhibit 90, 108–09).

With regard to Mr. Redding, the Tone committee specifically found:

Mr. Redding, as Senior Vice President in charge of the Oil & Gas Group, was Mr. Lytle's immediate superior, located in an adjoining office throughout the Penn Square period. There is substantial evidence that would support the following findings:

Mr. Redding apparently did not control Mr. Lytle's improper practices, despite his knowledge of many of them. He saw the large volume of Five Day Rule exception reports and knew that Mr. Lytle was processing loans for which he needed but had not obtained Redding's approval. Nevertheless, Mr. Redding never took action to stop this practice of Mr. Lytle's. Instead, he contented himself with sending back notesheets he did not approve for further work and declining to place his initials on certain loans, even though he often found that "the money was already out the door." Although he told Mr. Lytle that he was too close to Penn Square, Mr. Redding took no action to correct the situation when Mr. Lytle ignored his warnings.

In addition to failing to supervise Mr. Lytle, Mr. Redding failed in his own credit approval duties. His signature and approval were necessary for the larger of the Penn Square loans, and he was familiar with the details of many of

them. A number of these loans proved, upon examination in early July and subsequently, to have been of very poor quality. Mr. Redding did not protect the Bank from those loans of poor quality. Also, he failed to take action after the warnings by Ms. Kenefick and by the engineers. In addition, he failed to take action to see that the Bank's procedures as to loan documentation, collateral, and past dues were followed despite seeing a large volume of Penn Square Loans continually on exception reports.

Redding did not carry out the instructions Mr. Bergman says he gave Mr. Redding to switch the Penn Square participations to a direct loan basis. He did not even effectively accomplish the limited switch-over he admits to have undertaken.

Redding says that he took comfort from the "relatively clean" reports of the internal auditors in the reports on the October and December 1981 audits of Penn Square. It is at least open to serious question whether these reports could reasonably be interpreted as "clean"; the auditors did not think so.

Finally, when Mr. Lytle's personal loans were under investigation, Mr. Redding at first favored termination but later altered his recommendation and his memorandum on the subject at the request of his superiors. He never informed the group investigating the Lytle loans about any of the Penn Square problems. Instead, he joined with Mr. Bergman in assuring everyone that the Penn Square participations were of good credit quality.

The evidence that Mr. Redding was negligent is clearly sufficient to go to the jury, and the claim against him should not be dismissed.

(Exhibit 90, 109–111).

And with regard to Mr. Bergman, the Tone committee found:

Mr. Bergman was the Executive Vice President in charge of the Special Industries Department, which included the Oil & Gas Group. He was Mr. Redding's direct supervisor. Throughout the Penn

Square period, however, his responsibilities included a number of groups and divisions in addition to the Oil & Gas Group. He was not as intimately acquainted with the operations of the Mid–Continent Division as Mr. Redding.

There is substantial evidence that would support a finding that Mr. Bergman was negligent in his supervisory role and in reporting to his superiors. Mr. Bergman received the Five Day exception reports and other exceptions reports relating to the Mid–Continent Division. It appears that he did not take any effective action to investigate the cause of Mid–Continent's large number of exceptions or to clear them up. Nevertheless, he repeatedly assured Messrs. Coriaci, Melick, Baker, and others present at weekly GBS management meetings that substantive problems with exceptions and past dues did not really exist and that the complaints were the result of inaccurate reporting by the GBS Operations department. On one occasion (in November, 1981), he also informed the Corporate Office that this was the fact. When Baker told Bergman that Ms. Kenefick criticized the way in which Lytle ran the Mid–Continent Division, Bergman simply dismissed the matter as a "personality conflict" between Mr. Lytle and Ms. Kenefick without asking for the details of the complaints or making any other investigation.

In September or October of 1981, Mr. Baker became concerned when both Mr. Bergman and Mr. Redding demonstrated their lack of familiarity with Penn Square commitments by estimating the level of participations at approximately 50% of the actual number. Mr. Bergman then reassured Mr. Baker that the Penn Square loans were checked as carefully as if they were direct loans. It does not appear that he had a basis for this assurance. Although Mr. Bergman's accounts vary, he admits to receiving orders from Mr. Baker (or agreeing with him) that either all or at least the larger Penn Square loans should be changed to a direct basis. Yet, Mr. Bergman failed to see that this change was accomplished.

After the *American Banker* article on Penn Square appeared in April, 1982, Mr. Bergman gave further assurances to Mr. Baker concerning the conversion of Penn Square participations to direct loans and concerning the quality of all the transactions with Penn Square. Yet Mr. Bergman admits that in the interval between September and May, he neither asked for nor received any detailed reports from Mr. Redding concerning the conversation to direct loans. At most, he asked Mr. Redding how the matter was coming and received general assurances that it was progressing satisfactorily. In any event, it is now clear that almost none of the Penn Square loans were converted to direct loans by the Bank.

Mr. Bergman relied upon the Bank's internal audit reports on Penn Square, which he viewed as "relatively clean," as a basis for some of his later assurances. His view of these audit reports, however, is contrary to that of the auditors, and, in any event, he concedes that the reports did not purport to evaluate the creditworthiness of the Penn Square loans. Furthermore, although Mr. Bergman states that these audits were "routine" in nature, the auditors state that it is unusual for them to audit another bank in this fashion. The auditors also recall Mr. Bergman displaying a sense of urgency and suspicion about Penn Square operations at the time he sent them down to Penn Square.

Mr. Bergman went to Mr. Lytle's defense after Mr. Lytle's personal loans from Penn Square were disclosed. During the course of the deliberations regarding sanctions for Mr. Lytle, Mr. Bergman made no investigation of the Penn Square loans and said nothing about the problems with Penn Square; instead, he joined the other line officers in assuring the Chairman and others that the Penn Square loans were of good credit quality.

It should be noted, in considering the claims against Mr. Bergman, that he was seriously ill from approximately December, 1981, until March, 1982. To his

credit, at no time during the interviews did he assert his illness as an excuse. Also, he sent the auditors to Penn Square and gave orders for at least a limited switchover of Penn Square loans to a direct basis. Nevertheless, Mr. Bergman's apparent failure to supervise Mr. Redding and Mr. Lytle, and his repeated assurances that "all is well" when he had made little or no investigation, lead the Committee to conclude that there is sufficient evidence to support a finding of negligence against him and that the claim against him should not be dismissed.

(Exhibit 90, 111–14).

Based essentially on the foregoing, the plaintiffs contended that there was enough evidence for the jury to conclude that corporate employees were carrying out Continental policy because: The head of Continental's Mid–Continent division, John Lytle, was inadequately supervised, because Lytle was encouraged to buy participations from Penn Square, and because Continental did not fire Lytle when it found out that Lytle had borrowed more than one-half million dollars from Penn Square while Lytle was doing business on behalf of Continental with Penn Square. Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion For Judgment Notwithstanding the Verdict at 14–15. Recognizing the negligence of Lytle, Redding and Bergman, the evidence, in contrast, reveals that what went on at Continental with Mr. Lytle, Mr. Redding and Mr. Bergman was not in furtherance of corporate policy, but in direct countervention of it. The following represents an objective analysis of the evidence presented to the jury which forces me to conclude that Lytle, Redding and Bergman were not following corporate policy and that senior management of Continental and Continental's board of directors cannot be charged with knowledge such that Continental can be charged with RICO liability.

#### (4) Personnel and Lending Hierarchy

General Banking Services ("GBS") was a division of Continental which engaged in wholesale domestic lending, except real estate (Exhibit 90, 14). GBS was headed by George R. Baker, who was an executive vice president and who reported directly to the chairman of the board, Roger E. Anderson. (Exhibit 90, 14–15). GBS was, in turn, divided into several lending departments (Exhibit 90, 15). One such unit was the special industries unit headed by Gerald K. Bergman, who reported to Baker. (Exhibit 90, 15). The special industries group was in turn divided into units, one of which was called the oil and gas group, headed by John A. Redding, who reported to Bergman. (Exhibit 90, 15). The oil and gas group was further subdivided into groups, one of which was the Mid–Continent division headed by John Lytle, who reported to Redding. (Exhibit 90, 15).

To put the Mid–Continent division of which Lytle was responsible in perspective with GBS, of which Lytle's department was only a small part, it is helpful to understand that the Mid–Continent division's loans as a percentage of total GBS loans never exceeded, on an average basis, 15% of the average loans made by GBS. (Exhibit 90, 83). On an average basis, Mid–Continent's loans were 14% of GBS loans as of June 1982, up from 6.3% as of December of 1980. (Exhibit 90, 83). Although the dollar volume of Mid–Continent's loans were quite significant, Mid–Continent's loans were only a small part of the huge dollar volume of loans made by all of the operating units of Continental.

It is also helpful to understand that senior management and the board of directors of Continental were insulated from Lytle not only by the personnel hierarchy described above, but by the loan origination and review process. (Exhibit 90, 18–27). The senior management of Continental was known as the "corporate office." The loan origination and review process worked as follows.

When a loan, or a participation, was made by a lending officer supervised by Lytle, the officer was supposed to create two documents. One document was called an "approval notesheet" ("notesheet"), and the other document was called a "credit reporting form" ("CRF"). (Exhibit 90, 18–19). The notesheet described the lending

officer's analysis of the credit, and the CRF provided the data necessary for Continental to open the credit facility for the borrower. (Exhibit 90, 18–19). Each loan officer had a credit limit above which the officer could not approve a loan unless a person having adequate lending authority had given written approval for the credit. (Exhibit 90, 19). There was, however, a five-day rule which permitted the credit to be extended without written approval of the next higher authority provided that written approval was obtained in five days. (Exhibit 90, 19). It was then implicit that oral approval had been obtained. (Exhibit 90, 19).

The loan operations department of GBS was to collect the material supporting the loan and to maintain the documentation flow so that the lending officers could obtain missing approvals and documents. (Exhibit 90, 20). GBS loan operations prepared exception reports. One of the exception reports dealt with violations of the so-called five-day rule. (Exhibit 90, 20). These reports went to officers with the requisite lending authority (normally Redding for the Mid–Continent division) and to the head of the department (Bergman) and to Lytle. (Exhibit 90, 20–21). Even with an exception report, the borrower could still draw down on the credit. (Exhibit 90, 20). With respect to many Penn Square loans, Lytle never obtained the necessary approvals despite the exceptions. (Exhibit 90, 21). The Tone report found that Penn Square participations appeared on various exception reports prepared by GBS operations, but typically were not cleared up for extended periods of time, if ever. (Exhibit 90, 22).

After the loan was made, GBS loan review, which is separate from GBS loan operations, prepared data needed to "rate" loan quality. (Exhibit 90, 22). GBS loan review prepared a backup sheet for a separate entity known as loan administration. (Exhibit 90, 22). Loan administration rated loans. (Exhibit 90, 22–25)

Loan administration, separate from GBS altogether, but not part of the corporate office, would rate loans of $500,000 or more. (Exhibit 90, 23). The following scale was used: A = Prime; B = Satisfactory; C = More than normal risk; and D = Poor quality. (Exhibit 90, 23). Loans were to be rated or rerated annually. (Exhibit 90, 24). However, loan administration could not rate or rerate many credit files related to Penn Square, because GBS loan review could not prepare the necessary backup sheets because the necessary data was lacking. (Exhibit 90, 24).

Once again, back in GBS, there was a credit policy committee ("CPC") which included many heads of the departments within GBS, and which met weekly to monitor "C" and "D" rated loans to ensure that good lending practices were followed in GBS. (Exhibit 90, 25).

Loan administration, which once again is independent of GBS, collected information on problem loans and "C" and "D" rated loans and accordingly published a "watch list" for reporting to the corporate office and the board of directors. (Exhibit 90, 26). Essentially the "watch list" was to pull together the collective opinions of the lending officers, CPC and loan administration on problem loans so that the corporate office and the board could be advised. Significantly, no Penn Square loans were reported on the "watch list" until June of 1982 (Exhibit 90, 26–27). Penn Square failed on July 5, 1982. (Filing 276, Instruction 5).

(5) Corporate Office in the Dark

It is also clear that Continental, obviously not perfectly, followed a policy of critically evaluating its relationship with Penn Square. There is no evidence that the serious problems of Penn Square were ever communicated to the corporate office or the board of directors of Continental in such a manner that senior management or the board could be charged with having furthered or created a corporate policy to increase the dollar volume of its portfolio at the expense of portfolio quality. Clearly, there were "red flags" raised about what was happening at Penn Square, but no evidence suggests a fair inference that the corporate office or the board of directors promoted the "loan growth at any

price" policy that plaintiffs say Lytle sought to advance. Some specific instances will serve to illustrate the point.

Beginning in 1981, the volume of Mid–Continent's "exceptions and past dues" was frequently discussed by GBS loan operations staff. (Exhibit 90, 29). Lytle claimed that the exception reports were riddled with errors. (Exhibit 90, 29–30). Apparently Lytle's view was not inaccurate, since the bank's management generally recognized that loan operations was troubled by an out-moded computer system. (Exhibit 90, 30). The part of the system that related to loan operations was not revamped until October 1, 1982. (Exhibit 90, 29–30). The persistent loan operation problems, according to the Tone committee, were in part the cause of the Penn Square-generated exceptions and "past dues" being dismissed at the meetings as "paperwork" problems. (Exhibit 90, 30).

The operations and lending side of GBS both underwent internal audits regarding their treatment of loan exception reports as of July 15, 1981. (Exhibit 90, 31). The audits concluded in January of 1982 that while the loan operations side was accurately reporting documentation exceptions, many of the lending divisions lacked formal procedures to ensure that exceptions were being cleared up properly. (Exhibit 90, 31). The auditors asked Baker to respond to the administrative office by February of 1982, but as of the date Penn Square failed no response had been submitted. (Exhibit 90, 31).

Nevertheless, loan operations at GBS were engaged in "audits" of Penn Square. (Exhibit 90, 31). The first visit was in December of 1981 and the second visit was in February of 1982. (Exhibit 90, 31).

The audit team issued a report that suggested further "work" was required at Penn Square and Continental including the implementation of an electronic mail terminal, new procedures for the processing of Penn Square related loans which mandated that funds could not be disbursed absent a properly approved CRF and notesheet, participation agreements and supporting documents were to be required before disbursement, and title opinions and mortgage filings for secured loans were to be required prior to disbursement. (Exhibit 90, 32). While these procedures were required, Mid–Continent apparently largely ignored these suggested procedures. (Exhibit 90, 32).

The head of the "audit team," while identifying various problems at Penn Square, wrote a report which was "optimistic, suggesting that progress had been made and that the problems could be solved with additional effort." (Exhibit 90, 32).

Another "red flag" was a memorandum written by a young vice president named Kathleen Kenefick. (Exhibit 90, 33). Sometime in the summer of 1981 she prepared a memorandum. She essentially complained of a lack of control with regard to the loans being originated at Penn Square Bank. (Exhibit 90, 33). Kenefick discussed her concerns with Lytle and in fact showed him a draft of the memorandum. (Exhibit 90, 33). Baker obtained a copy of the Kenefick memorandum and kept it on his desk to remind himself of the problems raised in the memorandum. (Exhibit 90, 33–34). Baker had a discussion with Bergman about the Kenefick memorandum and criticisms of Lytle and the Mid–Continent division. (Exhibit 90, 33–34). Bergman dismissed the matter as a "personality conflict" without making any investigation. (Exhibit 90, 34). When Kenefick left Continental she did not mention the memorandum or any problems at Mid–Continent at the time. (Exhibit 90, 34). Kenefick left Mid–Continent for another job which was due in part to being offered excellent opportunities at a corporation and because she was frustrated with her experience working with Lytle. (Exhibit 90, 34).

Sometime in September of 1981, Baker, after he had read the Kenefick memorandum, became concerned about the level of Penn Square participations and asked both Bergman and Redding for current dollar totals. (Exhibit 90, 35). Each provided an estimate that was approximately half of what Baker later discovered to be the actual total of $519 million. (Exhibit 90, 35).

Baker indicated that he was concerned, not only about Bergman and Redding's ignorance of the amounts of loans involved, but about the " 'unreasonable concentration' " of loans coming through a small Oklahoma bank. (Exhibit 90, 35). Baker expressed these concerns to Bergman. (Exhibit 90, 35).

Although there was some dispute between Baker, Bergman, Redding and Lytle as to the definition of certain procedures, Baker did tell Bergman that "participation purchases from Penn Square (except for previous commitments) should be halted, and that those participations already purchased should be expeditiously converted to direct loans." (Exhibit 90, 35). Lytle indicated that he was never directed to stop purchasing participations, but rather was "encouraged" by Redding to place large loans on a direct basis. (Exhibit 90, 36). Lytle and Bergman defined large loans as those over $5 million, and Redding termed as large loans only those over $10 million. (Exhibit 90, 36).

Notwithstanding Baker's order, the vast bulk of participations were purchased, increased or renewed after Baker's order was given. (Exhibit 90, 37). Essentially, Baker's order was either not followed or misunderstood.

In November of 1981 another warning was raised. Two oil and gas engineers employed in the Mid–Continent division told Redding that they were concerned about Penn Square loans, particularly because reserve evaluations were in effect ignored because other collateral was used to justify lending more than the loan value of the reserves. (Exhibit 90, 37). Redding seemed sympathetic, told the engineers not to yield to pressure in making their evaluations, and Redding said that he would speak to Lytle. (Exhibit 90, 37). Redding did not speak with Lytle. (Exhibit 90, 37).

Every quarter the corporate office conducted a quarterly review with each of the major operating units of the bank. (Exhibit 90, 37). The third quarter review for GBS was held in November of 1981. (Exhibit 90, 38). This meeting included Anderson, Baker, Bergman and various

others. (Exhibit 90, 38). Penn Square problems were discussed. Baker introduced the topic and asked Bergman to discuss the problems. (Exhibit 90, 38). Bergman stated that there were Penn Square related "housekeeping problems" and they all related to documentation. (Exhibit 90, 38). There was no discussion at this meeting of any possible problems with the creditworthiness of these loans. (Exhibit 90, 38).

In August of 1981 Bergman asked Redding to send auditors to Penn Square, but Redding did not act promptly on this request and subsequently Baker and Bergman agreed that the bank's internal auditors should be sent to Penn Square to review Penn Square's records. (Exhibit 90, 38). The auditors made two trips and prepared two reports. (Exhibit 90, 38–42).

The first report according to the auditors was " 'a fairly negative report.' " (Exhibit 90, 40). According to Redding and Bergman, however, they believed the audit was " 'relatively clean.' " (Exhibit 90, 40). Bergman told Baker, who did not see the report, that the report was relatively clean. (Exhibit 90, 40).

In the second audit the auditors once again expressed concern and the auditors discussed with Bergman and Redding the contents of the report, including providing them with copies, which suggested serious problems at Penn Square. (Exhibit 90, 41). Although an auditor may have told Baker during a brief conversation, perhaps in a washroom, that Penn Square " 'was pretty frail,' " Baker never saw the audit reports and was not specifically informed of their contents. (Exhibit 90, 41–42).

Perhaps one of the most significant "red flags" was the discovery in the audits of a series of personal loans at preferential interest rates being made by Penn Square to John Lytle. (Exhibit 90, 42–43). This discovery was made on December 7, 1981 and was immediately reported to Mr. Hlavka, who was a senior auditor. (Exhibit 90, 42). Hlavka initiated an investigation of Lytle's account at Continental. (Exhibit 90, 42). The investigation, both at Penn Square and Continental, revealed that Lytle's personal

loans from Penn Square were in the amount of $565,000. (Exhibit 90, 42). Hlavka also concluded from his investigation that Lytle was living beyond his means. (Exhibit 90, 42).

Hlavka informed Redding, Lytle's immediate supervisor, of these loans in mid-December. (Exhibit 90, 43). Redding informed his direct superior, Bergman. (Exhibit 90, 42). According to Baker, he learned of these loans from Hlavka. (Exhibit 90, 42). Baker informed Roger Anderson at their next Friday morning meeting, which was late in December or early in January. (Exhibit 90, 42). Anderson was only told that a division manager had received a loan from a correspondent bank, and that the matter was being investigated. (Exhibit 90, 42–43). The information did not identify the division or Lytle. (Exhibit 90, 43).

On December 21, 1981, Hlavka and others met with Lytle to confront Lytle with the loans. (Exhibit 90, 43). Lytle expressed great surprise that the loans might create a conflict of interest, and stated that this was how Oklahoma bankers treated their friends and special customers. (Exhibit 90, 43). Hlavka was impressed by Lytle's open attitude toward the loans. According to Hlavka, he did not think that Lytle thought that he had done anything wrong. (Exhibit 90, 43). Hlavka advised Lytle to take his loans out of Penn Square Bank, which Lytle did. (Exhibit 90, 43). Jennings and Patterson at the Penn Square Bank helped Lytle relocate his loans at one of Penn Square's correspondent banks in Oklahoma and guaranteed those loans so the bank would take them. (Exhibit 90, 43). No one at Continental was informed that Penn Square employees had helped Lytle place his loans, and no one at Continental was informed that Penn Square employees had guaranteed Lytle's loans. (Exhibit 90, 43).

Thereafter there were various meetings that took place with various people at Continental. (Exhibit 90, 43–48). It is clear that neither Redding or Bergman ever suggested to senior management that Lytle should be terminated. (*See e.g.*, Exhibit 90 at 43). Indeed, Hlavka, the accountant in charge, was of the opinion that while Lytle had made a mistake, he should not be terminated. (Exhibit 90, 42–43). Furthermore, Bergman told Baker in late March or early April of 1982 that " 'two relatively clean audits had been performed at Penn Square.' " (Exhibit 90, 46). Baker did not only rely upon Bergman, but also contacted Hlavka around this time, and Hlavka's view that Lytle should not be terminated carried considerable weight with Baker. (Exhibit 90, 46).

In April of 1982 Roger Anderson met with Baker, Bergman, Redding, Hlavka and others to discuss the situation. (Exhibit 90, 46). At that meeting Baker and Bergman advocated keeping Lytle and imposing sanctions short of termination. (Exhibit 90, 46). Bergman, and perhaps Baker and Redding stated that the participations with Penn Square were of good quality. (Exhibit 90, 46). Mr. Hallagan of the legal department stated that Lytle should be terminated, pointing out that Lytle's action constituted a violation of the bank's code of ethics and that Lytle may have violated the law, although Hallagan did not have sufficient facts to prove Lytle's criminal intent. (Exhibit 90, 47). A representative from personnel agreed with Hallagan. (Exhibit 90, 47). This April meeting ended without any final decision by Anderson. (Exhibit 90, 47).

Between April 13, 1982 and May 12, 1982, Eugene Croisant, an executive vice president responsible for personnel, met with Roger Anderson, and they covered several topics. (Exhibit 90, 47). Included within the topics they covered was the question of whether Lytle should be terminated. (Exhibit 90, 47). Croisant advised Anderson to listen to his staff people, such as legal and personnel, rather than people from the line office who had personal involvement in the matter. (Exhibit 90, 47). Anderson responded that Hlavka, who had been silent earlier when Hlavka had been in a meeting with Anderson, had approached Anderson afterwards and expressed the opinion that Lytle had used bad judgment, but was not culpable and should not be terminated. (Exhibit 90, 47).

Thereafter, on May 12, 1982, Anderson once again met with Baker, Bergman, Redding, Hlavka, the bank's general counsel, and others. (Exhibit 90, 48). No one changed position regarding termination. (Exhibit 90, 48). As with the previous advice, there was no discussion of potential problems with the quality of Penn Square participations. (Exhibit 90, 48). Once again, Anderson concluded the meeting by saying that he wished to give the matter further consideration. (Exhibit 90, 48).

Finally, Baker and Roger Anderson had one final meeting on May 17, 1982. (Exhibit 90, 48). In a memorandum from Baker to Anderson dated May 17, 1982, Baker referred to a conversation that had occurred earlier in the day in which they had apparently decided to retain Lytle, but move him from oil and gas and give him no salary increases or incentive compensation for two years. The others were notified of this decision by circulation of a memorandum bearing the handwritten notation "Agree REA." (Exhibit 90, 48).

It is also clear, that while senior management was aware that some of its credits were "stale" in terms of rating, senior management did not encourage this practice. (Exhibit 90, 50–58). As of June 30, 1982, approximately $143.5 million or 13.4% of the approximate $1.073 billion of Penn Square-related loans and participations were unrated, and $186.7 million, or approximately 17.4%, were stale-rated. (Exhibit 90, 50). Of the $146.4 million identified by Continental as charge-offs in the second and third quarter of 1982, 50.2 million, 34.3%, were unrated, and $18.6 million, 12.7%, were stale-rated. (Exhibit 90, 50–51). Of the sixty charged off loans comprising the 146.4 million figure, 45 were rated in whole or in part. (Exhibit 90, 51). Of those 45 rated loans, 37 or 62% were rated B in whole or in part. (Exhibit 90, 51). A number of the charged off loans and participations were rated only as to amounts smaller than the ultimate credit granted, and in some cases considerably smaller than the charge off. (Exhibit 90, 51).

During the examination of Continental as of April 30, 1981, the Comptroller of the Currency determined that approximately 375 credits had not been reviewed within one year, with 55 of these credits not reviewed within two years. (Exhibit 90, 51–52). In September or early October of 1981, the senior national bank examiner for the Comptroller of the Currency met with Anderson, Hlavka, and others to review a draft of the 1981 comptroller's report and his recommendations. (Exhibit 90, 51–52). This was standard procedure. The examiner went through the 1981 examination report page by page, and the meeting lasted from one to two hours. (Exhibit 90, 52). When he reached the loan review system discussion of the report he discussed the problem of stale-rated credits. (Exhibit 90, 52). Although he did not place undue emphasis on that section of the report, he specifically mentioned the problems that stale-rated credits posed to the quality of the bank's loan portfolio. (Exhibit 90, 52). He also mentioned the problem of unrated loans falling through "cracks" in the bank's review and rating system. (Exhibit 90, 52). Roger Anderson acknowledged that a problem existed, and said "'we'll work on it.'" (Exhibit 90, 52). In response to the criticisms of the Comptroller, Baker supervised distribution of a memorandum drafted by his assistant to all group and division heads in GBS. (Exhibit 90, 52). The memorandum, distributed on December 7, 1981, instructed lending officers to fulfill their responsibility to ensure that credits were rerated. (Exhibit 90, 52).

The GBS quarterly review for the fourth quarter of 1981 was held on February 24, 1982. (Exhibit 90, 52). In attendance were Baker, Anderson, and others. (Exhibit 90, 52). The presentation on the Special Industries unit was given by someone other than Bergman because Bergman was ill. (Exhibit 90, 52–53). Special Industries' quarterly review report for the fourth quarter of 1981 contained a page entitled "'Loan Risk Distribution Analysis'" which listed the total current outstanding loans of special industries by loan ratings of "A" through "E." (Exhibit 90, 53). It showed approximately 600 million in the "E" cate-

gory which meant " 'unrated.' " (Exhibit 90, 53). Anderson expressed interest in the loan risk distribution analysis and asked about the meaning of the "E" rating which had not been used previously in the bank. (Exhibit 90, 53). The person representing Special Industries told the group that "E" rating represented the unrated loans in Special Industries, which he believed was caused by a backlog in loan administration. (Exhibit 90, 53).

Sometime during the weeks following the quarterly review session for the fourth quarter Anderson asked the GBS comptroller to break down by rating category the GBS and real estate past due and nonperforming loans as of December 31, 1981. On March 26, 1982 Anderson received a memorandum and two analytical charts showing that 10% of GBS's past due loans, totalling $72 million or so, were " 'not rated.' " (Exhibit 90, 53).

Anderson sent the memorandum back with a note requesting further information on, among other things, the nonrated loans. (Exhibit 90, 53). Elliott, the person who was to respond, wrote a memorandum to Anderson on April 5, 1982 in which he stated that an inordinate number of the nonrated credits existed in oil and gas credits in the Mid–Continent division where rapid growth and loan volume caused a backlog of the records maintenance in the fourth quarter. (Exhibit 90, 54). He also stated that " 'Mid–Continent has actively pursued with noticeable improvement their past due and not rated loans during the First Quarter of 1982.' " (Exhibit 90, 54). The person writing the memorandum had received the information concerning the cause and "noticeable improvement" in Mid–Continent's past due and nonrated loans from, none other, than Lytle. (Exhibit 90, 54).

The GBS quarterly review for the first quarter of 1982 was held on June 2, 1982 and once again was attended by Baker, Anderson, and others. (Exhibit 90, 54). Once again the nonrated loans were extemely high. (Exhibit 90, 54). Members of the corporate office expressed concern and a general need for examination and control

of the unrated loans. (Exhibit 90, 54–55). Bergman specifically identified Penn Square as the source of the " 'largest part' " of that figure, but "reassured people that he believed that 90% of the unrated loans would eventually be rated 'B.' " (Exhibit 90, 54–55).

As a result of the stale-rated problem and examination of the Comptroller's examination report, Baker directed a subordinate to write a memorandum. (Exhibit 90, 54). In that memorandum GBS acknowledged that it was responsible for policing the rating system. (Exhibit 90, 56). The lending divisions of Continental, rather than loan administration, another separate department of Continental but still not a part of the corporate office, was responsible for seeing to it that information necessary for rating was supplied. (Exhibit 90, 56).

### (6) Lytle's Salary

Plaintiffs argue that Lytle was in effect compensated to pursue a loan-growth-at-any-price philosophy. The Tone committee carefully examined this question in light of a then existing lawsuit which had been brought against it by certain Continental stockholders. The lawsuit, a stockholders derivative suit, complained that " 'Continental established bonus incentives based on loan volume expansion. Thus, during the class periods, ... Continental created structures and applied internal pressures which encouraged or permitted lending officers at every level of authority to take on greater lending risks.' " (Exhibit 90, 85).

The Tone report carefully looked at this question. It concluded that neither salary nor bonus compensation plans were based directly on loan volume expansion or encouraged the undertaking of greater lending risks. In particular, in regard to Lytle the Tone committee found that allegations that Lytle had been compensated to produce loan growth at any price to be nonsense. The Tone committee report states as follows:

> Based upon its investigation, the Committee concludes that this allegation is without merit and should be stricken. Neither salary nor bonus compensation is

based directly on loan volume expansion or encourages the undertaking of greater lending risks.

### 1. *Base Salary*

Base salary is principally based on an officer's salary grade. Salary grades are assigned based on job responsibilities and do not necessarily correspond to Bank titles. Salary ranges are established for each salary grade based on extensive banking industry, peer group, and local market salary survey data. Base salary is adjusted annually on April 1, principally on the recommendation of the officer's immediate supervisor within the constraints of salary ranges and departmental pools for salary increases. Salary grade promotions also result in increases in base salary. The persons recommending and approving promotions also recommend a base salary within the established salary range for the officer's new salary grade.

In 1981, Lytle's base salary was equivalent to the average base salary of the lending officers of his grade, grade 18. His merit increase in 1981 as a percent of base salary was lower than the average grade 18, both in Special Industries and Bank-wide.* He received no salary grade promotions after his promotion to head of the Mid–Continent Division on October 1, 1980.

Occasionally, the salary survey data indicates that a particular skill area is falling behind competitive salaries. In some instances, a special adjustment pool is designed to address the particular problem area. The Corporate Personnel Department identified nine separate special adjustment pools that were designed and allocated during the period of October, 1979 to January, 1982, the three largest of which dealt with salary grade "compression" resulting from high starting salaries that caused insufficient spread between salary levels. A special Oil & Gas pool was designed and allocated on April 1, 1981 to make salary levels in Oil & Gas more competitive with other banks' energy departments and salaries

in the industry. Lytle's share of this Oil & Gas pool was slightly less than the average share given out.

### 2. *Management Incentive Plan*

#### a. *The performance measures are not stated in terms of or directly related to loan volume growth.*

The Bank has designed an incentive plan to recognize performance measures in terms of return on equity and peer group performance. Thus, the Bank's incentive plans are not directly tied to loan volume growth. Peer group performance criteria were not biased toward volume criteria, but rather included: earnings to assets; earnings to capital and reserves; capital and reserves to assets; capital, loan reserve, and long term debt to assets; net interest margin/taxable equivalent; net charge-offs to total loans; and loan loss coverage multiple.

#### b. *The management incentive plan is based on corporate results, not on results of individual units.*

The pool of funds available for the Management Incentive Plan ("MIP") is determined by consolidated corporate results. The total pool is allocated to department pools strictly according to a formula based on grade level aggregate base salary. Thus, extraordinary loan growth in Special Industries had no direct effect on the amount of incentive awards in the Special Industries Department. Loan growth achieved in Special Industries may have enabled the corporation to meet return on equity and other performance targets and earn higher incentive payments for everyone, but any such benefits were shared proportionately with the 15 other departmental pools.

#### c. *The award patterns for key Oil & Gas personnel confirm that rewards were not based on volume growth.*

The incentive awards for the departments and individuals involved with the extraordinary loan growth related to

---

* Lytle received no merit increase in 1982.

Penn Square were not disproportionate to awards in other divisions, groups, and departments.

—While the Special Industries incentive pool as a percent of aggregate base was slightly higher than the average for other Bank lending and non-lending departments, this resulted from a higher average grade level of personnel within Special Industries (four departments received more as a percent of base than Special Industries and seven received less.)

—Base salary and incentive awards of Special Industries personnel for 1980 and 1981 at each grade level for grades 12–19 were comparable to other lending and non-lending personnel in similar grades.

—During 1977–1981, base salary increases and incentive awards for Baker, Bergman, Redding, and Lytle were comparable to those given other personnel in the same grade.

—Key Oil & Gas and Loan Administration personnel salaries and incentive awards were comparable to other officers of similar grade.

—The distribution of awards within Special Industries was not concentrated with Oil & Gas personnel. This indicates that individual managers did not abuse the system by concentrating awards.

### 3. *Profit Sharing Plan*

The Bank's profit sharing plan is a Bank-wide plan covering substantially all employees. Distributions are at a fixed percent of base salary (graduated scale) and are based on a profit sharing formula tied to net income of the Corporation. Profit sharing awards amounted to approximately 10% of Lytle's base salary for each of the last five years.

### 4. *Stock Option Grants*

Stock option grants, which are limited to management level personnel, are made in a fashion similar to that of the MIP. Departments are allocated pools, and the Corporate Personnel Department reviews the individual awards for reasonableness and consistency of application.

Lytle received awards of 1,200 shares in February, 1978 and November, 1979. In October, 1981, Lytle's stock option grant totaled 1,250 shares, a modest increase over the previous years' totals, and equal to the median number of shares for the 28 participants from Special Industries.

Given these facts, the Committee concludes that the Bank's compensation system did not reward simple loan volume expansion or encourage its lending officers to incur greater lending risks. To the contrary, Lytle's compensation did not reflect the huge increase in loan volume of his Mid–Continent Division.**

(Exhibit 90, 85–91).

### (7) Loan Growth Policy

The Tone committee specifically analyzed the general question of whether Continen-

** Many allegations have been made with regard to the Bank's compensation of Mr. Lytle which the Committee believes should be responded to and put to rest. As of September 1, 1978, following his promotion to grade 17, Mr. Lytle had a base compensation of $46,000 per annum. He received a $3,200, or 7%, merit increase on April 1, 1979, and a $5,400, or 11%, merit increase on April 1, 1980. On October 1, 1980 he was promoted to a grade 18 and put in charge of the Mid–Continent Division. In connection with that promotion he received a $5,400 salary increase. On April 1, 1981 he received a $6,000, or 10%, merit increase and a $3,000 adjustment from the "compensation pool" described on page 87. As previously indicated, Lytle's merit increase in 1981 as a percent of base salary was lower than the average grade 18, both in Special Industries and Bank-wide. Lytle received no increases in base compensation after his April 1, 1981 adjustment. From September 1, 1978 to June 30, 1982 Lytle's annual base salary, including promotion increases, rose from $46,000 to $69,000, or 50%.

In each of the years Lytle received amounts approximating 10% of his base salary under the Bank-wide profit sharing plan described on page 89.

On February 3, 1978 and March 19, 1979 Lytle received stock option grants of 1,200 shares and on October 19, 1981 a grant of 1,250 shares, all at the then market price of the stock. As previously indicated, these grants were in line with grants awarded to his peer group. On April 23, 1981 he exercised the 1978 and 1979 grants. The market price of the stock at the date of exercise was $35.25 or $10.16 per share in excess of the average grant prices. The difference

tal had engaged in a loan growth at any price philosophy. Once again, in the derivative lawsuit brought against Continental, the complaining party alleged what plaintiffs contend here:

> "Continental did not during the class period [September 1, 1981 through July 29, 1982 inclusive], maintain high quality credit standards. Instead, Continental implemented a policy to increase the dollar volume of its loan portfolio even if that required a reduction in the quality of its loan portfolio."

(Exhibit 90, 80 (quoting para. 26(a) of the *Goodman* complaint)).

While the Tone committee concluded that the bank was undoubtedly pursuing business vigorously, it also concluded that the bank's planning and policy documents made it clear that the bank targeted the quality, rather than the quantity, of its loan portfolio as its primary goal. (Exhibit 90, 80). The Tone committee Report found that what was happening at Penn Square arose from the decentralized nature of Continental's management and was not typical, but rather was atypical, of the operation of Continental. (Exhibit 90, 80–85). Indeed, the Tone committee Report found that the policies of Continental's senior management and board of directors was consistently to maintain high quality loans, as opposed to loan growth. The Committee Report states:

> The Bank's annual Strategic Plans, and the texts of the presentations of those Plans to the Board of Directors and to the Bank's senior management, negate the existence of any policy to expand the loan portfolio at the expense of credit quality standards. For example, in his 1981 Statement on Corporate Strategy, Roger Anderson stated: "We need to make it clear that the fundamental goal is rate of return and the creation

of economic value, not asset size." Similarly, in presenting the 1980 Financial Plan, Donald Miller stated: "We conclude that loan growth alone is not the answer to reducing the risk of meeting our EPS [earnings per share] target." Furthermore, the Bank's 1981 Strategic Plan reaffirms "last year's conclusion that 'Loan Growth Alone is Not the Answer.'" The focus of the Bank-wide policy set by the Corporate Office was on improving the quality of the Bank's loan portfolio, as reflected in various rates of return measures, and not simply on increasing the dollar value of the loan portfolio.

The planning documents generated by the "strategy centers" of the Bank, *i.e.*, the Oil & Gas Group and the Commercial Real Estate Department, also reflect an intent to expand their portfolios without sacrificing credit quality standards. Thus, the Strategic Planning Forms of the Oil & Gas Group for 1981 and 1982 cite as a strategic objective to "[g]row, gain share." At the same time, however, Oil & Gas states that one of "[t]he essential things we intend to do over the next 2, 3 years" is to "[m]aintain credit quality." Furthermore, the Oil & Gas Group distinguished itself from its competitors by noting that the competitors were "willing to sacrifice credit quality to gain business."

Similarly, the Commercial Real Estate Department's Strategic Planning documents stress caution in growth. For example, the Real Estate Services Strategic Plan 1980–1982 rejected "rigid adherence to productivity measures" because such adherence "could result in quotas inimical to sound lending underwriting and practice." Additionally, the Strategic Planning Form for 1981 recognizes that the condominium "market has al-

---

between the exercise price and the grant price, multiplied by the number of shares, gave rise to taxable income for Lytle in the year of grant of $24,372. The 1981 grant of 1,250 shares expired upon his termination.

In 1980, by virtue of a change in the Bank's Management Incentive Plan as described on pages 87–89, Lytle became eligible for an award under that plan. He was allocated an award

under the plan of 20% of his then base compensation, or $12,000. This amount was paid to him in 1981. This allocation was comparable to the average received by all grade 18 lending officers. Fourteen grade 18 lending officers received a higher percentage allocation and thirteen received a lower one. Lytle received no Management Incentive award for 1981.

ready reached its maturity." Consequently, with respect to that market, Commercial Real Estate abandoned its growth objectives and became content "to maintain the market share we want of that declining market."

In considering the allegations of overaggressive lending on the part of the Bank as a whole, it is useful to consider the Bank's policy of decentralization of lending authority and the source of disproportionate increases in the loan portfolio during the relevant period.

As already noted, a significantly disproportionate number of the exceptions reported in the various exception reports related to the Mid–Continent Division. Further, an analysis of growth in the Bank's commercial loan portfolio over the eighteen month period ended June 30, 1982, shows the following:

|  | General Banking Services Domestic | Special Industries | Oil & Gas Group | Mid–Continent Division |
|---|---|---|---|---|
|  | (millions) | | | |
| Average outstandings December 1980 | $13,365 | $4,693 | $2,651 | $ 833 |
| Average outstandings June 1982 | 16,476 | 6,594 | 4,275 | 2,300 |
| Increase in eighteen month period | $ 3,111 | $1,901 | $1,624 | $1,467 |
| Percentage increase in eighteen month period | 23.3% | 40.5% | 61.3% | 176.2% |
| Special Industries increase as a percentage of General Banking Services—Domestic | | | | 61.1% |
| Oil & Gas Group increase as a percentage of: | | | | |
| Special Industries | | | | 85.5% |
| General Banking Services—Domestic | | | | 52.2% |
| Mid–Continent Division increase as a percentage of: | | | | |
| Oil & Gas Group | | | | 90.4% |
| Special Industries | | | | 77.2% |
| General Banking Services—Domestic | | | | 47.2% |

Mid–Continent Division average loans as a percentage of:

|  | December 1980 | June 1982 |
|---|---|---|
| General Banking Services—Domestic | 6.3% | 14.0% |
| Special Industries | 17.8% | 34.9% |
| Oil & Gas Group | 31.5% | 53.8% |

As can be seen from the above data, during the eighteen month period ended June 30, 1982, the portfolio of loans outstanding for the Mid–Continent Division grew by 176% and constituted 14% of the entire GBS–Domestic portfolio at June 30, 1982 as contrasted with 6% at December 31, 1980. This growth constituted 47% of the growth in the entire GBS domestic portfolio during this period. Of even more significance, it constituted 90% of the growth in the Oil & Gas Group and 77% of the growth in Special Industries.

During this same period, the portfolio of Penn Square related loans grew from approximately $200 million to approximately $1.075 billion, an increase of $875 million. This represented 60% of the increase in the Mid–Continent Division, 46% of the increase in Special Industries and 28% of the increase in GBS–Domestic.

As explained earlier in this report, the problems in the Penn Square portfolio arise largely from improper lending practices. No evidence of similar practices in connection with other loans was found. During the year ended December 31, 1982 the Bank's provision for credit losses was $492 million, including a $220 million provision for Penn Square related credits. Net writeoffs during the year amounted to $393 million including $191 million resulting from Penn Square related credits. Net credit losses as a percentage of average loans and lease receivables was 1.15% and excluding Penn Square related credit losses was .61%.

In conducting its investigation and reaching its conclusion, the Committee was mindful of the potential for tension between growth of portfolio and loan quality. The Committee could find no evidence, however, in its investigation of the several non-Penn Square loans discussed above or in its review of the Bank's policies that management pursued, or indicated a willingness to countenance, a policy of sacrificing loan quality to achieve any other goal. On the contrary, the need to maintain loan quality was emphasized in management statements. In addition, as noted above, in the case of every credit investigated by the Committee other than those related to Penn Square, the actions of the lending officers appear to have been well within the range of the permissible business judgment the lending officers were entitled to exercise.

(Exhibit 90, 80–85).

### (8) Conclusion

From the foregoing, it is clear that Continental did not promote the atmosphere contended by plaintiffs, but rather, through its corporate office and its board of directors, attempted to pursue legitimate policy goals. The following are especially materially undisputed facts which were presented to the jury on this case.

First, the relationship between Continental and Penn Square was negligently mishandled by Lytle, Redding and Bergman, and, among other things, oil and gas loans were made and disbursed which could not be justified by proven reserves.

Second, the personnel and lending hierarchy of Continental stressed decentralization of management, and insulated the operational lending side of Continental from the senior corporate management side and Continental's board of directors. For example, although the dollar volume of Penn Square loans was quite significant, the amount of the loans constituted only a small portion of GBS loans. Lytle, Redding and Bergman all were clearly junior managers who had no direct reporting responsibility to senior corporate management or the board of directors. Moreover, despite various procedures which were in place to ensure loan quality, such as a formal procedure for noting exceptions to lending policies and a formal procedure for rating and rerating loans, no Penn Square loan was placed on the "watch list" until June of 1982. Penn Square failed in July of 1982. The "watch list" was intended to pull together the collective opinions of the lending officers and various credit review personnel, so that senior management and the board of directors could be advised of problem loans by receipt of the "watch list."

Third, although there were many red flags raised about what was happening at Penn Square, there was no evidence presented to the jury which would suggest a fair inference that the corporate office or the board of directors promoted the loan growth at any price policy that plaintiffs say Lytle sought to advance. Simply put, senior corporate management and the board of directors of Continental were kept in the dark. For example, it was Continental's auditors who discovered the improper loans by Penn Square to Lytle. Numerous meetings were held to determine the proper course of action to take against Lytle. Some of these discussions involved Roger Anderson, chairman of the board. Significantly, no one told Anderson that the Penn Square account was a problem, and in fact Anderson was told that Penn Square participations were of good quality. Even the auditor who discovered the loans, after in-

terviewing Lytle, recommended that Lytle not be fired.

Fourth, Lytle was not given any special salary or compensation treatment. Indeed, Lytle received comparable wages to those in similar grade positions throughout Continental. For 1981, for example, Lytle's raise was less than the average, and he received no increase in base compensation after April 1, 1982.

Fifth, the stated policy of Continental was to stress loan portfolio quality and not mere asset growth. Moreover, except for Penn Square, the actions of lending officers at Continental appear to have been well within the range of permissible business judgment that lending officers were entitled to exercise. Penn Square was a bizarre anomaly.

Without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment with regard to the RICO claim: as a matter of law the activities of Continental's employees did not further the corporate policy goals of Continental, and judgment notwithstanding the verdict must be granted on the RICO count.

### E. Other Claims

I have examined Continental's other claims for setting aside the jury verdict. While some of the arguments are particularly persuasive, such as the claim that plaintiffs did not prove justifiable reliance on the alleged misrepresentations, given the standard of review I must apply in this case regarding the motion for judgment notwithstanding the verdict, I should not substitute my judgment for that of the jury. While I would come to different conclusions than the jury came to, I cannot say as a matter of law that the conclusions I would reach are the only reasonable conclusions. Accordingly, the balance of Continental's motion will be denied.

### II. ATTORNEYS' FEES

The plaintiffs move for attorneys' fees (filing 297) on the basis that they recovered pursuant to a jury verdict on the civil RICO claim. Because I have found that judgment notwithstanding the verdict must be·

granted in favor of Continental on the RICO count, I will deny the motion for attorneys' fees (filing 297) as moot. I express no opinion as to the substantive merits of the application for attorneys' fees.

IT IS ORDERED THAT:

1. Continental's motion for judgment notwithstanding the jury verdict (filing 298) is granted in part and denied in part as follows:

   (a) The clerk is directed to enter judgment notwithstanding the verdict in favor of Continental and against the plaintiffs on the RICO count;

   (b) Otherwise, the motion for judgment notwithstanding the jury verdict is denied;

2. Plaintiffs' motion for attorneys' fees (filing 297) is denied as moot.