**K & S PARTNERSHIP, Robert F. Swartzbaugh; Richard W. Kelley, Charles C. Myers, Don Erftmier, Carl L. Boschult, William A. Lorenz, Nancy D. Lorenz, Harley D. Schrager, Samuel A. Ancona, Joseph I. Ancona, Carl Ancona, Michael J. Ancona, Byron D. Strattan, Dennis Strauss, Tony LaMalfa, Kevin J. Cloonan, Stephen H. Simon, Frederick J. Simon, Alan Simon, Gary Gunderson, Frank Woods Petersen, Thomas T. Bernstein, Donald D. Graham, Albert Block, Mark Anthony, Eugene McIntyre, Dorothy McIntyre, John E. Ryan, Paul Alperson, Gerald E. Palmer, Ronald K. Parsonage, William W. Smith, O. Douglas Osterholm, and Bernard Magid, Appellees,**

v.

**CONTINENTAL BANK, N.A., Appellant.**

**K & S PARTNERSHIP, Robert F. Swartzbaugh; Richard W. Kelley, Charles C. Myers, Don Erftmier, Carl L. Boschult, William A. Lorenz, Nancy D. Lorenz, Harley D. Schrager, Samuel A. Ancona, Joseph I. Ancona, Carl Ancona, Michael J. Ancona, Byron D. Strattan, Dennis Strauss, Tony LaMalfa, Kevin J. Cloonan, Stephen H. Simon, Frederick J. Simon, Alan Simon, Gary Gunderson, Frank Woods Petersen, Thomas T. Bernstein, Donald D. Graham, Albert Block, Mark Anthony, Eugene McIntyre, Dorothy McIntyre, John E. Ryan, Paul Alperson, Gerald E. Palmer, Ronald K. Parsonage, William W. Smith, O. Douglas Osterholm, and Bernard Magid, Appellants,**

v.

**CONTINENTAL BANK, N.A., Appellee.**

Nos. 89–2678, 89–2679.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 23, 1991.

Decided Dec. 6, 1991.

Rehearing and Rehearing En Banc Denied Jan. 23, 1992.

Mark I. Levy, Chicago, Ill., argued (Pamela K. Black, James J. Frost and Martell J. Bundy, Omaha, Neb., and James C. Schroeder and Richard H. Ferri, Chicago, Ill., on the brief), for appellant.

Thomas H. Dahlk, Omaha, Neb., argued (Sandra L. Doughtery, David S. Houghton and Glenda J. Pierce, on the brief), for appellees.

Before JOHN R. GIBSON, FAGG and WOLLMAN, Circuit Judges.

WOLLMAN, Circuit Judge.

On September 12, 1990, we filed our opinion reversing the jury verdict entered in favor of K & S Partnership and other plaintiffs (plaintiffs) and affirming the judgment notwithstanding the verdict entered in favor of Continental Bank, N.A. (Continental). Thereafter, plaintiffs filed a petition for rehearing, with a suggestion for rehearing en banc, alleging that our opinion had applied a standard of review to the motion for judgment notwithstanding the verdict that was in conflict with the standard of review heretofore adopted by this court. After careful review, we concluded that our opinion employed language that might be read by some as being in conflict with that used in our earlier opinions. Because it was not our intention to in any way depart from the well-established standard of review laid down by our prior opinions, we vacated our September 12, 1990, opinion on January 23, 1991. We now file this opinion in its place.

Continental Bank appeals from the district court's[1] judgment in favor of plaintiffs entered on a jury verdict that awarded plaintiffs damages under theories of Continental's secondary liability to plaintiffs. Plaintiffs cross-appeal from the district court's grant of judgment notwithstanding the verdict on their Racketeer Influenced and Corrupt Organizations Act (RICO) claim. 127 F.R.D. 664. We reverse the judgment entered on the jury verdict and affirm the district court's judgment notwithstanding the verdict.

## I.

We summarize the evidence produced at trial, viewing it in the light of the standard of review set forth later in this opinion. In the late 1970s and early 1980s, Penn Square Bank (Penn Square) of Oklahoma City, Oklahoma, loaned money extensively for oil and gas exploration and production.[2] Included in this lending were "drilling loans" made to Eagle Petroleum Company and its two principals, Wesley Markle and Terry Stanhagen (collectively Eagle), to explore for oil and gas. Eagle secured the loans with letters of credit that the limited partners in its oil and gas programs obtained from their own banks in favor of Penn Square. In most cases the letters of credit, along with cash paid directly to the partnerships, constituted the limited partners' investment in the programs. Using letters of credit as collateral allowed investors to take tax deductions for the entire amount of their investment instead of just the cash portion. The letters of credit in the Eagle programs generally expired after two years, and the drilling loans were repayable approximately three months prior to that time.

Under standard practice, before the drilling loan came due the partnership would apply for a "production loan" to produce and sell the oil and gas that had been discovered. When making a production loan, the bank would release the limited partners' letters of credit and substitute the oil and gas reserves as collateral. If, however, the bank refused to grant a production loan, the bank would call the letters of credit and use the proceeds to satisfy the outstanding drilling loan.

Banking regulations limited Penn Square's lending to a percentage of its capital, and further limited the amount it could lend to any single borrower. Thus, for Penn Square to make new loans it needed other banks to participate in or purchase a share of its loan portfolio. Because the oil and gas industry was thriving at the time, there was competition among major banks to purchase participations from Penn Square and other lenders. Some fifty other banks across the country bought oil and gas participations from Penn Square. For example, Chase Manhattan Bank purchased some $212 million

---

1. The Honorable Richard G. Kopf, United States Magistrate for the District of Nebraska, presided at trial pursuant to the parties' consent.

2. For a highly readable account of Penn Square's rise and fall and of Continental's participation, along with that of several other major banks, in Penn Square's ultimately ill-fated oil and gas lending policies, see M. Singer, *Funny Money* (1985).

worth of participations. *See Chase Manhattan Bank, N.A. v. FDIC*, 554 F.Supp. 251 (W.D.Okl.1983). Continental's participations ultimately totaled some $1.075 billion.

Continental began participating in Penn Square loans in 1978, including loans made to Eagle. Generally, each of Continental's participations was evidenced by two documents: a loan participation agreement and a certificate of participation. The loan participation agreements specifically provided that Penn Square would not, without Continental's prior written approval, release the letters of credit that secured the drilling loans.

Contrary to the terms of the loan participation agreements with Continental, the certificate of participation prepared by Penn Square stated that Penn Square could release collateral and substitute new collateral without Continental's consent.

In February 1981, Eagle sent a Continental loan officer a package of Eagle offering materials, including a twenty-six page "Investment Brief" prepared by Investment Search, Inc. Page nine of the report, summarizing Eagle Drilling Partnership 1981's "strengths," stated that Eagle had returned letters of credit to limited partners before the expiration date in five of its fourteen private oil and gas partnerships. According to the report, this record indicated Eagle's ability to select prospects that generated revenues sufficient to obtain production loans. The record does not indicate that anyone at Continental read the report or this portion of it.

Later in 1981 there were signs within Continental of problems with the Penn Square participations. In the summer of 1981, Kathleen Kenefick, a Continental vice-president, wrote a memo about her concerns with the participations, including Continental's practice of lending money to Penn Square for 30 to 90 days before doing a credit analysis. Both John Lytle, who headed Continental's Mid–Continent division, which was in charge of Penn Square participations, and George Baker, a Continental executive vice-president who headed General Banking Services, of which Lytle's Mid–Continent division was a part, knew about the memorandum.

Baker became concerned with the level of Penn Square participations after reading the Kenefick memorandum. Baker told Gerald Bergman, who headed a special industries unit that included the Mid–Continent division, to discontinue purchasing participations in drilling fund loans supported by letters of credit and to convert the participations already purchased into direct loans. A Report of the Special Litigation Committee of the Board of Directors of Continental Illinois Corporation (the *Tone Report*) later stated that despite these directions, the "vast bulk of the participations were purchased, increased, or renewed after Baker's order was given."

In November 1981, two oil and gas engineers employed in the Mid–Continent division informed John Redding, a senior vice-president at Continental and Lytle's direct superior, that lending on Penn Square loans exceeded what oil and gas reserve evaluations indicated were justified. Redding apparently took no action with this information. One Continental engineer who questioned the wisdom of drilling fund loans was repeatedly told that letter-of-credit loans were "lucrative."

In December 1981, an audit revealed that Penn Square had made a series of personal loans to Lytle in the amount of $565,000 at preferential interest rates. After numerous consultations with Lytle's superiors, Roger Anderson, Continental's chairman, imposed monetary sanctions against Lytle but did not discharge him. About the same time as this discovery, Continental increased Lytle's lending authority to $10 million.

As time went on, several of the Eagle drilling loans were converted to production loans, replacing limited partners' letters of credit with oil and gas reserves as security interests. On July 5, 1982, Penn Square was taken over by the Federal Deposit Insurance Corporation. Eagle, Markle, and Stanhagen all eventually declared bankruptcy.

## II.

Plaintiffs invested in nine of the seventeen oil and gas limited partnerships Eagle formed between 1979 and 1981. In general, plaintiffs were told before they invested, often by Markle or Stanhagen, that Eagle had a good track record in exploring for and producing oil and gas, that prior programs had received production loans, and that no letters of credit had been called.

Before investing, however, plaintiffs received offering materials that stated a warning on the cover page that "THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK." The circular also warned that Eagle "may not be able to successfully conduct the activities contemplated," and that since "oil and gas exploration ... is considered speculative, ... no assurance can be given that all or any part of an investment ... will be recovered." The circular also stated that "[d]ue to the unpredictability of oil and gas exploration and development, the results of previous operations can not be construed as indicative of the results that may be achieved by the Partnership." Each investor signed a suitability letter acknowledging the "speculative nature" and "high degree of risk" of the investment and verifying that he had "a sufficient net worth to sustain a loss of his entire investment in the Partnership in the event such loss should occur."

Continental bought participations in only five of the nine programs in which plaintiffs invested. Continental had no contact with the plaintiffs and made no statements to them before they invested in Eagle.

Plaintiffs lost their investments when Eagle and Penn Square failed. They brought this suit against Continental in 1984, alleging that Continental had knowingly assisted Eagle "in fabricating its 'never had a letter of credit called' track record." Plaintiffs' Brief at 6. In particular, plaintiffs allege that Markle and Stanhagen violated securities law by misrepresenting Eagle track records in two respects: (1) although Markle and Stanhagen accurately stated that production loans had been received in the earlier programs and letters of credit released, those statements were misleading because of the failure to disclose that the oil and gas reserves were in fact insufficient to warrant the production loans; and (2) while Markle and Stanhagen accurately told investors that Eagle had repurchased its first two programs, that statement was deceptive because it did not reveal that Eagle repurchased the programs because it had not found adequate reserves.

At trial, plaintiffs' banking expert, John Bricker, a professor of finance at Southern Methodist University in Dallas, Texas, testified that Continental's initial participations in the Penn Square loans were not prudent because Stanhagen and Markle did not have the experience and expertise to discover oil and gas in sufficient quantities to fully repay the principal and interest they had borrowed from Penn Square. An internal Continental memorandum dated December 26, 1978, indicates that Continental became interested in the Eagle programs only after a well-known drilling contractor became connected with the Eagle programs.

Continental employees testified that Penn Square released letters of credit and made production loans without consulting with or informing Continental. Plaintiffs did not controvert this testimony; Bricker testified that he had seen no evidence of Continental's consent to Penn Square's release of letters of credit or grant of production loans.

Lytle did not testify about Continental's relationship with Eagle, invoking his Fifth Amendment privilege against self-incrimination. The jury was informed that Lytle, along with a senior vice president of Penn Square, had been convicted of felony crimes involving dishonesty.

Dennis Winget, a former Continental vice-president and Penn Square employee, testified that it was difficult to sell limited partnership interests in a drilling fund without a track record and that calling letters of credit would make it more difficult to sell such interests. Redding likewise testified that calls of letters of credit

in drilling fund programs like Eagle's would signal an unsuccessful venture.

The district court submitted the case to the jury on four counts: (1) aiding and abetting a violation of Section 10 of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) and Rule 10b–5 of the Securities and Exchange Commission; (2) conspiring to violate the securities laws; (3) knowingly participating in a breach of fiduciary duty; and (4) RICO (18 U.S.C. § 1962). The jury returned a verdict against Continental on all four counts. On Continental's motion for judgment notwithstanding the verdict, the district court set aside the RICO count, finding that the alleged acts were contrary to Continental's policies and that Continental could not be held vicariously liable under RICO for the acts of its employees. The court denied the motion on the other counts and entered judgment against Continental, stating:

> While some of [Continental's] arguments [for setting aside the jury verdict] are particularly persuasive, such as the claim that plaintiffs did not prove justifiable reliance on the alleged misrepresentations, given the standard of review I must apply in this case regarding the motion for judgment notwithstanding the verdict, I should not substitute my judgment for that of the jury. While I would come to different conclusions than the jury came to, I cannot say as a matter of law that the conclusions I would reach are the only reasonable conclusions.

Memorandum Opinion, 127 F.R.D. at 686.

In its verdict, the jury awarded damages of approximately $438,000 to plaintiffs on each count. Post-verdict juror affidavits stated that during deliberations the jury had "divided the total damage amount by four" and thus apportioned the damages "equally among the four different theories of recovery." Concluding that the affidavits rather than the actual verdict reflected the jurors' true intentions, the court amended the verdict to multiply the jury's award by four.

## III.

The plaintiffs' position was summarized by the district court:

> [P]laintiffs contended that Penn Square and Continental helped Markle, Stanhagen and Eagle engage in a "pyramid" scheme. As long as the banks would make production loans, oil and gas promoters could sell their securities regardless of the sufficiency of the oil and gas used to collateralize the production loans. The benefit to the banks would be large interest bearing loans, and, despite the failure due to lack of oil and gas reserves of certain production loans, if enough loans were made the profits to the banks would exceed any losses which might occasionally occur. As long as the banks would make production loans, Markle, Stanhagen and Eagle had a good "track record" to point to in order to induce others to invest.

Memorandum Opinion at 668.

Continental challenges the judgment on the grounds that the district court incorrectly applied the law of secondary liability and that the evidence was insufficient to support the jury's verdict.

We review the district court's application of the law *de novo*. *Garionis v. Newton*, 827 F.2d 306, 309 (8th Cir.1987). In deciding whether Continental is entitled to judgment notwithstanding the verdict,

> we must consider the evidence in the light most favorable to [plaintiffs], assume all conflicts in the evidence were resolved by the jury in [plaintiffs'] favor, assume [plaintiffs] proved all facts [their] evidence tends to prove, and give [plaintiffs] the benefit of all favorable inferences that may reasonably be drawn from the proven facts. A judgment notwithstanding the verdict "should be granted only when all the evidence points one way and is susceptible of no reasonable inferences sustaining [plaintiffs'] position."

*Frieze v. Boatmen's Bank of Belton*, 950 F.2d 538, 540 (8th Cir.1991) (quoting *Washburn v. Kansas City Life Ins. Co.*, 831 F.2d 1404, 1407 (8th Cir.1987)) (citation omitted). *See also Caudill v. Farmland Indus.*, 919 F.2d 83, 86 (8th Cir.1990). Continental cannot prevail on its motion "if the

evidence so viewed would allow reasonable jurors to differ as to the conclusion that could be drawn." *Cole v. Control Data Corp.,* 947 F.2d 313, 315 (8th Cir.1991). For similar formulations of the standard of review to be applied to motions for judgment notwithstanding the verdict, *see, e.g., Nelson v. Production Credit Ass'n,* 930 F.2d 599 (8th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 417, 116 L.Ed.2d 438 (1991); *Morgan v. Arkansas Gazette,* 897 F.2d 945 (8th Cir.1990); *Gilkerson v. Toastmaster, Inc.,* 770 F.2d 133 (8th Cir.1985); *Dace v. ACF Indus., Inc.,* 722 F.2d 374 (8th Cir. 1983).

### A. *Aiding and Abetting Liability*

■ The three theories of secondary liability under which the district court submitted the case to the jury have similar elements under federal common law. Because the elements of aiding and abetting liability are also the core elements of the other theories, we will examine that theory first.

We evaluate a claim for aiding and abetting a violation of the securities laws under a three-part test:

(1) the existence of a securities law violation by the primary party (as opposed to the aiding and abetting party);

(2) "knowledge" of the violation on the part of the aider and abettor; and

(3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.

*FDIC v. First Interstate Bank of Des Moines, N.A.,* 885 F.2d 423, 429 (8th Cir. 1989). Continental's arguments on appeal assume that Eagle's actions defrauded plaintiffs. Therefore, we examine Continental's liability for aiding and abetting under the assumption that Eagle is primarily liable to plaintiffs for securities law violations.

■ As for the second element, that of whether or not Continental had "knowledge" of Eagle's primary violation, Continental asserts that because it had no duty to disclose knowledge of a primary violation to the plaintiff investors, plaintiffs were required to but failed to prove that Continental had actual knowledge of the primary violation, here Eagle's fraud.[3] In *FDIC v. First Interstate Bank,* a case in which a bank also sought to defend itself against claims for aiding and abetting a primary violator's fraud, we held that a defendant's general awareness of its overall role in the primary violator's illegal scheme is sufficient knowledge for aiding and abetting liability. *Id.* 885 F.2d at 429–31. Such knowledge may be proved by and inferred from circumstantial evidence, including facts available to the defendant's employees. *Id.* at 431; *Woods v. Barnett Bank of Fort Lauderdale,* 765 F.2d 1004, 1009 (11th Cir.1985) "Knowledge may be shown by circumstantial evidence, or by reckless conduct, but the proof must demonstrate actual awareness of the party's role in the fraudulent scheme." *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 96 (5th Cir.1975). If an illegal scheme exists and a bank's loan assists in that scheme, the bank's knowledge of the scheme is the crucial element that prevents it from suffering automatic liability for the conduct of insiders to whom it loaned the money. *Id.* at 96 (citing Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution,* 120 U.Pa.L.Rev. 597, 630–31 (1972). "A plaintiff's case against an aider, abetter, or conspirator may not rest on a bare inference that the defendant 'must have had' knowledge of the facts." *Schlifke v. SeaFirst Corp.,* 866 F.2d 935, 948 (7th Cir.1989) (quoting *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 496–97 (7th Cir.1986)).

In *First Interstate,* we held that the bank had recklessly ignored signs of its depositor's misappropriation of funds in favor of seeking potential profits from its involvement with the depositor. 885 F.2d

---

**3.** The district court's Instruction No. 27 required the plaintiffs to "prove by a preponderance of the evidence that Continental Bank or its agent had actual knowledge that the track record of early programs was being falsely portrayed and that Eagle Petroleum Corporation, Wesley Markle or Terry Stanhagen were doing so knowingly and with intent to defraud."

at 432. Severe recklessness can satisfy the scienter requirement, at least where the alleged aider and abettor owes a duty to the defrauded party. *Woods,* 765 F.2d at 1010.

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 1010 (quoting *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)). In *Woods,* the court affirmed the imposition of aiding and abetting liability based upon a bank officer's letter of recommendation written solely for the purpose of currying favor with the bank's clients. The letter contained statements that the officer had no knowledge of, even though he was aware that the recipient would rely on the letter.

In *First Interstate,* the defendant bank had a statutory duty to disclose information to regulatory authorities when it knew or suspected that a depositor was using the bank to carry on an illegal scheme. *Id.* at 433. In *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986), we quoted *Woodward,* 522 F.2d at 97, for the proposition that "[w]hen it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter." *Id.* at 625.

Whether or not the existence of a duty to disclose affects the level of knowledge required to establish aiding and abetting, the record does not establish that Continental had any duty of disclosure here. There is no evidence that Continental, in its dealings with Eagle or Penn Square, undertook to communicate or disseminate information to the plaintiffs with an intent or awareness that plaintiffs would use it in the purchase or sale of a security.

Moreover, the record is deficient of probative evidence that Continental had even a general awareness of an Eagle or Penn Square illegal scheme. Plaintiffs place significance on the testimony of former Continental employees who were aware that calling letters of credit in oil and gas programs such as Eagle's was important for attracting investors to future programs. This is no indication, however, that Continental knew that Eagle was promoting a false track record. Continental's bare receipt of the Investment Search Report summarizing Eagle's programs does not establish that Continental knew that Eagle was misrepresenting its track record, especially because there is no evidence that Continental knew anything about the reserve levels of the production loans referred to in the report.

In addition, the record contains no evidence from which reasonable jurors could find that Continental had an interest in assisting Eagle or Penn Square in producing a false track record. In *Metge,* we reversed the district court's summary judgment, finding that "although the record is not very illuminating on the question of [the defendant's] benefit from IEI's delayed bankruptcy, we find sufficient evidence at least to give rise to an inference that [the defendant] may have benefitted at the expense of the certificate holders from IEI's renewed lease on life." 762 F.2d at 629. Thus, we found that the facts presented a jury question on aiding-and-abetting liability. *Id.* at 630.

Here, however, the plaintiffs did not produce evidence at trial establishing that the interest Continental received on letter-of-credit loans would outweigh Eagle's occasional production loan default, or that anyone at Continental thought this would be possible. The testimony of Continental's employees that letter-of-credit loans were "lucrative" explains Continental's willingness to participate in Penn Square's loans, but it is not enough to support an inference

that Continental knew of a scheme by Eagle to defraud.

What the record does show is that Continental's management at the time of the Penn Square participations was plagued with problems that permitted the poor judgment of some employees to prevent it from perceiving the risk of its involvement with Penn Square. As the district court stated, "[T]here is no question but that certain employees of Continental were negligent," a statement fully supported by the testimony at trial and by the findings included in the *Tone Report.*

The record shows that Lytle pursued an aggressive and risky lending policy that his superiors failed to adequately supervise. Baker's directions in late 1981 to discontinue letter-of-credit loans participations were not carried out, due to lack of supervision, and, perhaps, according to the record, misunderstanding. Lytle's personal debt to Penn Square bank constituted an unethical conflict of interest that may well have clouded his judgment, but it is an insufficient basis for a finding that Continental agreed to assist Penn Square and Eagle in creating a false track record to attract investors.

Furthermore, whether the production loans Continental participated in were insufficiently supported by oil and gas reserves is not a matter of mathematical precision. Plaintiffs' banking expert testified that determining the prudent loan value of a given reserve is a matter of judgment without a fixed standard in the banking industry. Moreover, the record does not disclose that plaintiffs were aware of guidelines that Continental and Penn Square used in making loans. Thus, plaintiffs could not have known what reserves the banks considered adequate for granting a production loan.

■ The district court permitted the jury to find that Penn Square acted as Continental's agent, thus allowing the jury to attribute Penn Square's knowledge and actions concerning the Eagle loans. The record lacks evidence that would enable a reasonable jury to make such a finding. Although the certificates of participation allowed Penn Square to substitute collateral and thus grant production loans without Continental's consent, they were in conflict with the loan participation agreements on that point. There was no other evidence that Continental authorized Penn Square to act for it, that Penn Square accepted such an undertaking, or that Continental had any control over Penn Square or its actions concerning Eagle.

A bank may be willing to take a chance on a new and potentially valuable customer who does not meet its normal credit requirements. Although it is true that "if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability," *Woodward,* 522 F.2d at 97, the evidence here made plain that letters-of-credit and production loan participations were hardly an atypical practice for banks in the late 1970s and early 1980s. Indeed, the profitability of such loans, by itself, is an obvious and legitimate business justification.

In *Metge,* we noted that otherwise unremarkable events viewed together may suggest an unusual pattern of events intimating an illegal scheme. 762 F.2d at 626. Speculative investments, however, are not enough to hold a private enterprise liable to others. Accordingly, we conclude that plaintiffs failed to produce evidence from which it could reasonably be found that Continental knew of any scheme to aid Eagle in falsely portraying its track record to investors.

■ The third element of aiding and abetting liability is substantial assistance in the achievement of the primary violation. Establishing this element also requires the plaintiff to show that the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort. *Metge,* 762 F.2d at 624.

Continental asserts that its business dealings with Penn Square were nothing more than routine business transactions and thus could not have constituted substantial assistance. In *Metge* and *First*

*Interstate* we held that a party's involvement in only routine business transactions will not necessarily protect it from aiding and abetting liability. We need not decide whether there were more than routine business transactions involved here, however, because we conclude that there is no evidence that Continental's actions proximately caused plaintiffs' loss. The thrust of plaintiffs' claim is that had they known the facts concerning Eagle's fabricated track record, they would not have invested in the Eagle partnerships. Plaintiffs' bare allegations, however, are not sufficient to support a finding that they were entitled to rely on Continental's participation in production loans as representations on which to base their investment decisions in the light of the knowledge plaintiffs had at the time they made their investments. When plaintiffs chose to invest in Eagle partnerships, they chose to subject themselves to the risks made explicit by the warnings and disclaimers contained in the Eagle offering materials. When Continental chose to participate in Penn Square loans, it evaluated other entities to determine its own course of conduct and did not guarantee its conclusions to the world at large. "Mindful of the potentially devastating impact aiding and abetting liability might have on commercial relationships," *Woods*, 765 F.2d at 1009 (citations omitted), we will not uphold aiding and abetting liability in a relationship between investor and lending bank as attenuated as that between plaintiffs and Continental without more evidence than we have here.

### B. *Other Secondary Liability Theories*

▮ The jury also returned verdicts in favor of plaintiffs for conspiracy to violate the securities laws and knowing participation in a breach of fiduciary duty. Knowing participation in a breach of fiduciary duty "is analogous to a cause of action ... for aiding and abetting a securities fraud," where the primary violation involves a breach of fiduciary duty. *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir.1986). Likewise, liability for civil conspiracy is in substance the same thing as aiding and abetting liability. Civil conspiracy requires an agreement to partic-

ipate in an unlawful activity and an overt act that causes injury, so it "do[es] not set forth an independent cause of action" but rather is "sustainable only after an underlying tort claim has been established." *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 n. 7 (D.C.Cir.1984); *accord Mizokami Bros. v. Mobay Chem. Corp.*, 660 F.2d 712, 718 n. 8 (8th Cir.1981); *Rotermund v. United States Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir.1973).

Thus, all three theories of secondary liability here rise or fall together. Because Continental is not liable for aiding and abetting securities fraud, it did not assist in breaching any fiduciary duty Eagle or Penn Square owed to plaintiffs. Likewise, Continental may not be held liable on the civil conspiracy claim because plaintiffs did not prove a substantive violation, much less an agreement to participate in one of the substantive offenses. Therefore, we find that Continental is not secondarily liable to plaintiffs under any of these theories.

### C. *Conclusion*

We reverse that part of the judgment imposing secondary liability on Continental. As a result, we need not examine the damages issue. We affirm the judgment notwithstanding the verdict on plaintiffs' RICO claim on the basis of the district court's thorough memorandum opinion.