**Karl VOHS, Plaintiff,**

v.

**Eldon MILLER, et al., Defendants.**

**No. CIV. 03–3528RHKAJB.**

United States District Court,
D. Minnesota.

July 1, 2004.

Robert C. Moilanen, Carolyn G. Anderson and Timothy J. Becker, Zimmerman Reed, PLLP, Minneapolis, Minnesota, for Plaintiff.

Geoffrey P. Jarpe, Michael C. McCarthy and Julian C. Zebot, Maslon Edelman Borman & Brand, LLP, for Defendants Eldon Miller, Todd Miller, David Johnson, and Jeffrey Houdek.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

In one of several related matters arising out of the massive bankruptcy of Minneapolis-based broker-dealer MJK Clearing, Inc. ("MJK"),[1] Plaintiff Karl Vohs, an indi-

---

1. *See, e.g., Stephenson v. Deutsche Bank AG,* 282 F.Supp.2d 1032 (D.Minn.2003); *In re*

vidual investor, has brought a putative class action against the directors and officers of MJK's parent company, Stockwalk Group, Inc. ("Stockwalk"), alleging that their statements touting Stockwalk's performance violated federal and state securities and anti-fraud laws.[2] Defendants Eldon Miller, Todd Miller, David Johnson, and Jeffrey Houdek (collectively, "moving Defendants") have brought a motion to dismiss.[3] Because the Amended Complaint fails to generate the strong inference of scienter required by federal law, and because the state law claims are preempted, the Court will grant that motion.

## Background

Headquartered in Minneapolis, Minnesota, Stockwalk was—until 2002—a publicly-traded company providing traditional and online securities brokerage services, investment banking, and clearing services. (Am.Compl.¶ 16.) It was created to capitalize on a trend toward the trading of securities on the Internet. (*Id.*) Among its activities, Stockwalk had an extensive securities lending business, which it ran out of MJK, its clearing subsidiary. In an ordinary securities lending transaction, one party, usually a broker-dealer, loans securities to another party, usually another broker-dealer, in exchange for cash collateral that slightly exceeds the value of the securities. This cash collateral is "marked to the market," so that, as the price for a particular stock rises and falls, cash is delivered to or returned from the lender. From March 1999 through September 2001, securities lending became an increasingly important source of revenue for Stockwalk. (*Id.* ¶ 28.)

The securities lending department at MJK was run by Thomas Brooks. (*Id.* ¶ 16.) While reporting directly to moving Defendants, he engaged in a series of exceptionally improvident transactions involving thinly traded securities. For example, from November 2000 to June 2001, MJK borrowed and then re-loaned $192 million worth of GenesisIntermedia ("GENI") securities. (*Id.* ¶ 23.) Similarly, in May 2001, MJK advanced cash collateral exceeding $50 million to borrow and then re-loan the bonds of Imperial Credit Industries, Inc. (*Id.* ¶ 24.) In both instances, the securities were borrowed from Native Nations Securities, Inc. ("Native Nations"), an inadequately-capitalized broker-dealer operating out of New Jersey. (*Id.* ¶ 23.) As this loan activity—and the subsequent defaults—increased, Brooks attempted to hide the scale of his losses by filing false Loanet and FOCUS Reports.[4] (*Id.* ¶ 31.)

---

MJK Clearing, Inc., 2003 WL 1824937 (D.Minn. April 7, 2003), aff'd, 371 F.3d 397 (8th Cir.2004).

**2.** Vohs has also sued Ernst & Young, which audited MJK's books. Several days after Vohs filed his Amended Complaint, however, the Court dismissed similar claims against that party in *Ferris, Baker Watts, v. Ernst & Young*, 293 F.Supp.2d 1003 (D.Minn.2003). Pending an appeal in that related matter, Vohs has voluntarily dismissed his claims against the accounting firm.

**3.** Defendant Thomas Brooks, who is appearing pro se in this matter, has answered in the form of a general denial and has not joined the motion to dismiss.

**4.** Loanet is a private vendor that provides automated trade processing services to the securities lending market. Through Loanet, broker-dealers automate a large percentage of their securities lending business. FOCUS Reports ("Financial and Operational Combined Uniform Single Reports"), on the other hand, must be filed periodically by broker-dealers with the SEC. While firms that fail to file accurate FOCUS Reports are subject to liability under Section 17(a), that section does not contain a private right of action. *See, e.g., Deviries v. Prudential–Bache Sec., Inc.*, 805 F.2d 326, 328 (8th Cir.1986).

On May 8, 2001, the accounting firm of Ernst & Young issued a report to Stockwalk's audit committee. In that report, Ernst & Young noted that the securities lending group was not doing enough to document its risk assessment process:

> To mitigate the credit or counterparty risk associated with the securities lending business, the securities lending group reviews counterparty financial information (i.e., Regulatory FOCUS reports or financial statements) annually. However, formal documentation of the annual credit reviews, including management's conclusions, rationale for such conclusions and the underlying financial information, was not maintained in all cases. The rapid growth of the securities lending business over the past two fiscal years coupled with the economic slowdown increases the overall credit risk to the Company. We recommend management enhance the counterparty evaluation process to provide for more robust documentation and retention standards.

(Zebot Aff. Ex. I; *see also* Am. Compl. ¶ 36).[5]

Despite burgeoning cash-flow problems in the summer of 2001, Stockwalk's public pronouncements remained upbeat. On May 8, 2001, Stockwalk issued a press release quoting Eldon Miller:

> "We have curbed our losses and have made strides toward profitability," said Miller. "The integration of Miller Johnson Kuehn, Inc. with our acquisitions, R.J. Steichen and Company and John G. Kinnard, Inc., has given us the chance to vigorously streamline our operations and implement significant cost savings measures ... which will help drive more of the company's revenues to the bottom line. We have built Miller Johnson Stei-

chen Kinnard, Inc. (MJSK), to be a lean organization positioned to effectively benefit from economics of scale, expanded distribution and enhanced market presence."

(*Id.* ¶ 33.) On August 6, 2001, Miller said: "I am very optimistic about the future of our business, and believe we have taken the necessary steps to strategically structure our operation to enhance our earning capabilities." (*Id.*)

In early August 2001, Stockwalk sent shareholders its Report on Form 10–K. In the report, the company stated:

- "All three of our broker-dealer subsidiaries are in compliance with all net capital requirements."
- "[T]he clearing business provides for many growth opportunities and thus will continue to expand this part of our operation in the future."
- "When we engage in stock lending, we collect cash deposits from brokers and pay down higher interest bearing lines of credit."
- Stockwalk had been audited "in accordance with auditing standards generally accepted in the United States."

(*Id.* ¶ 48.)

In September 2001, the value of the thinly traded securities borrowed and re-loaned by MJK dropped precipitously. (Moilanen Aff. Ex. C at 4.) As it was obligated to do, MJK returned cash collateral to various broker-dealers in exchange for the now-worthless securities. (*Id.*) It was unable, however, to recoup the cash collateral it had extended to Native Nations. (*Id.*) The Securities Investor Protection Corporation ("SIPC") placed MJK into liquidation on September 27, 2001. (Am.Compl.¶ 31.) By February 2002,

---

**5.** The Ernst & Young report is one of several documents, including reports by Fitch Risk Management and Deloitte & Touche, refer- enced to and relied upon in the pleadings. *See Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 546 n. 9 (8th Cir.1997).

MJK's meltdown was more than Stockwalk could financially bear, and it filed for Chapter 11 bankruptcy. The failure of MJK, with losses between $80–$200 million, proved to be the largest in the thirty-year history of SIPC. (Moilanen Aff. Ex. C at 4.)

After MJK's collapse, SIPC commissioned a report from Fiske Risk Management outlining flaws in MJK's risk assessment processes:

> According to the Trustee's complaint [in *Securities Investor Protection Corp. v. MJK Clearing, Inc.*, Adv. Proc No. 01–4257(RJK) ], MJK Clearing's senior management failed to implement basic control structures to monitor the business and reporting practices of the securities loan department. In the absence of adequate supervision, the firm's securities lending exposure grew in an unsupervised fashion. For instance, management was unaware of the continuously increasing mark-to-market discrepancies in the securities lending book. The discrepancies existed for several months prior to the firm's failure but management only became aware of the problems when it was too late to salvage the company....
>
> MJK Clearing extended cash loans in excess of $200MM to Native Nations, a securities firm with equity capital of approximately $5MM. In September 2001, this single exposure accounted for over 23% of MJK Clearing's total assets. The magnitude of this exposure to any individual counterparty violates basic risk management principles. Furthermore, MJK Clearing failed to adequately analyze the market or liquidity risks associated with the collateral it received to guarantee the loans.
>
> On the most basic level, all financial firms should have procedures in place to approve counterparties and establish notional credit limits. Additionally, firms should establish exposure limits for business units and assess the quality of the collateral they hold. According to the Trustee's filing, MJK Clearing never established such procedures.

(Moilanen Aff. Ex. C at 7–8.)

## Standard of Decision

"Dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and destined to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles, Mo.*, 244 F.3d 623, 627 (8th Cir.2001). A cause of action "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 740 (8th Cir.2002) (internal citations omitted) (citing *Kohl v. Casson*, 5 F.3d 1141, 1148 (8th Cir.1993)). In analyzing the adequacy of a complaint's allegations under Rule 12(b)(6), the Court must construe the complaint liberally and afford the plaintiff all reasonable inferences to be drawn from those allegations. *See Turner v. Holbrook*, 278 F.3d 754, 757 (8th Cir.2002).

## Analysis

Vohs alleges that Defendants deceived investors into believing that Stockwalk was a prudent investment when it was, in fact, precisely the opposite. In so doing, Vohs asserts that Defendants violated Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"), Section 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t ("Section 20(a)"), and Minnesota common law prohibitions against fraudulent misrepresentation and civil conspiracy. Defendants have moved to dismiss the claims against them on several grounds, including failure to properly plead scienter and preemption. The Court

begins its analysis with Section 10(b) and Rule 10b–5.

## I. Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b–5

The Amended Complaint alleges Defendants violated Section 10(b) of the 1934 Act. Under Section 10(b), it is unlawful for any person, "directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe ...." 15 U.S.C. § 78j(b). Section 10(b) is not limited to a purchaser or seller of securities, but rather "reaches any deceptive device used 'in connection with the purchase or sale of any security.'" *Id.* (quoting 15 U.S.C. § 78j(b)).

Rule 10b–5, adopted by the SEC pursuant to its rule-making authority, states that "[i]t shall be unlawful for any person, directly or indirectly":

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Rule 10b–5 is coextensive in scope with Section 10(b). *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

■ While allegations of fraud are generally subject to the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, certain aspects of Section 10(b) and Rule 10b–5 fall under special pleading standards of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b)(2) ("the Reform Act"). The Reform Act requires that a complaint alleging violations of Section 10(b) and Rule 10b–5(b) must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind" respecting "each act or omission alleged to violate" these rules. *Id.* (emphasis added). The Court must therefore view the Amended Complaint "to determine whether [it] set[s] forth facts that give a *strong* reason to believe that there was a reckless or intentional wrongdoing." *In re Navarre Corp.*, 299 F.3d 735, 745 (8th Cir. 2002) (emphasis added).

■ Vohs alleges a severely reckless violation of Rule 10b–5. While negligent conduct does not establish a Rule 10b–5 violation, *Ernst & Ernst*, 425 U.S. at 215, 96 S.Ct. 1375, severely reckless conduct does, *K & S Partnership v. Continental Bank, N.A.*, 952 F.2d 971, 978 (8th Cir. 1991). Severely reckless conduct includes only

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Florida State. Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654 (8th Cir.2001) (internal quotation omitted).

■ Vohs argues that the Amended Complaint generates a strong inference of severe recklessness. To support this contention, Vohs relies on the totality of the allegations pleaded in the Amended Complaint. These include:

- Moving Defendants' executive positions within a small company and Brooks's reporting responsibilities. (Am.Compl.¶¶ 2–6, 58.)
- Ernst & Young's report suggesting more robust documentation in the securities lending department. (*Id.* ¶ 36, 45.)
- A conversation between Todd Miller and Thomas Brooks about the creditworthiness of Native Nations. (*Id.* ¶ 36.)
- The Report on Form 10–K signed by each moving Defendant anticipating a moderation in the growth of the stock lending business. (*Id.* ¶ 45.)
- The scale of securities lending when compared to Stockwalk's overall size. (*Id.* ¶¶ 22–24, 34.)
- The length of the time period over which the loan activity with Native Nations occurred. (*Id.* ¶¶ 22–24.)
- Moving Defendants' knowledge of Stockwalk's cash flow problems. (*Id.* ¶ 36.)
- The failure to demand a payment of $15.9 million from Native Nations in August 2001. (*Id.* ¶ 24.)
- The failure to reconcile bank statements. (*Id.* ¶ 31.)

(*See* Pl.'s Mem. Op. Summ. J. at 23–24.) Combined with the sheer scale of the loss and moving Defendants' failure to implement basic controls, Vohs argues that these allegations are sufficient to generate a strong inference of severe recklessness.

The Court disagrees. While Vohs has certainly pleaded that Stockwalk was mismanaged, a plaintiff must do more under the Reform Act than allege reckless management. In the absence of market manipulation or fraud on the market claims, a plaintiff must generate a strong inference that the defendant's statements or omissions were severely reckless. Allegations of mismanagement are only relevant to the extent they bear on things either said or left unsaid. Therefore, to generate a strong inference of scienter, Vohs must allege "highly unreasonable statements or omissions" involving "an extreme departure from the standards of ordinary care" that pose a risk of misleading investors "so obvious that the defendant must have been aware of it." *Green Tree Fin. Corp.*, 270 F.3d at 654. He has not done so here.

Aside from conclusory allegations, there is nothing in the Amended Complaint to suggest that it was highly unreasonable for Eldon Miller to say that Stockwalk had "curbed its losses" or that he was "very optimistic" about its future. (Am. Compl.¶ 33.) Nor are there particularized allegations indicating that it was an extreme departure from ordinary care for moving Defendants to state that MJK was "in compliance with all net capital requirements," poised for "growth," and audited "in accordance with [generally accepted] auditing standards." (*Id.* ¶ 48.) While Vohs asserts that the Ernst & Young report was a "slap in the face" alerting the moving Defendants to problems in the securities lending department, that report only recommended standards for documentation and does not meaningfully address the practices that led to Stockwalk's demise.[6]

6. Vohs also argues that the reports commissioned by SIPC demonstrate severe recklessness. While these reports outline basic risk management and internal control problems at MJK, they do not—for several reasons—generate a strong inference of scienter. Most significantly, these reports were not produced until long *after* MJK's meltdown. Because moving Defendants had no access to these reports during the relevant time period, they cannot be charged with knowledge of their contents. To hold otherwise would be to countenance "pleading fraud by hindsight." *Navarre*, 299 F.3d at 742 (internal quotations

Accordingly, because the Amended Complaint does not "set forth facts that give a strong reason to believe that there was reckless or intentional wrongdoing," *Navarre*, 299 F.3d at 745, the Court will dismiss the Section 10(b) claim against moving Defendants.

## II. Section 20(a) of the Exchange Act of 1934

■ Vohs also alleges that Defendants were "controlling persons" under Section 20(a) of the Exchange Act of 1934. Section 20(a) imposes liability upon persons that control violators of, among other things, Rule 10b–5:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as the controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To establish a prima facie case under this section, a plaintiff must allege "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (internal quotation omitted).

■ Vohs has alleged that Defendants controlled Stockwalk. (*See* Am. Compl. ¶ 64–67.) As with any corporation, Stockwalk "can only act through its employees and agents." *Suez Equity Investors v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir.2001); *see also Caterpillar v. Great American Ins. Co.*, 62 F.3d 955, 963 (7th Cir.1995). Therefore, to state a claim that Stockwalk was "a primary violat[or]" of the securities laws, *Boguslavsky*, 159 F.3d at 720, Vohs must allege unlawful activity on the part of "a particular agent" of the company, *Suez Equity*, 250 F.3d at 101. Because the Court has found that the Rule 10b–5 claims against four of the five defendants are defective, the sole candidate for agency is Thomas Brooks, the only non-moving defendant. The allegations against him, however, are insufficent to establish a primary violation on the part of Stockwalk.

The Amended Complaint convincingly alleges that Brooks's lending was spectacularly unwise. (*See, e.g.,* Am. Compl. ¶¶ 27–31.) In only one instance, however, does Vohs come close to alleging an actual violation of the 1934 Act on Brooks's part. In paragraph 31 of the Amended Complaint, Vohs states: "On information and belief, during the summer of 2001, Brooks attempted to falsify and hide [his] improvident stock lending activities" by "alter[ing] Loan[et] Reports" and by facilitating the "filing [of] false F[OCUS] Reports with regulators." (Am.Compl.¶ 31.) The filing of false FOCUS reports and the imputing of false data into Loanet state potentially actionable misrepresentations under Rule 10b–5. *See In Re Kidder Peabody Sec. Lit.*, 10 F.Supp.2d 398, 413 (S.D.N.Y.1998). Moreover, Vohs has alleged that Brooks—

---

omitted). Moreover, the reports make clear that the problems at MJK were, in fact, widespread in the securities lending industry. As the Fiske report states, "it is likely that the control procedures at other securities firms are similarly incompatible with best practices." (Moilanen Aff. Ex. C at 8.) Thus, even

if moving Defendants could be charged with knowledge of the contents of those reports, their statements would not represent "an extreme departure from the standards of ordinary care" in the securities lending industry. *Green Tree Fin. Corp.*, 270 F.3d at 654.

unlike the moving defendants—engaged in "deliberately illegal behavior" of a kind "that can only happen intentionally." *Stephenson*, 282 F.Supp.2d at 1057, 1068 (internal quotation omitted). This generates a strong inference of an intentional misrepresentation to regulators and counterparties, and, at the very least, a severely reckless one with respect to the investing public. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir.2000) (holding that a plaintiff is "not required to establish that the defendants actually envisioned that members of the Class would rely upon the alleged misrepresentations when making their investment decisions").

Although these allegations suggest the outlines of an actionable claim, they have not been pleaded with the particularity required by the Reform Act. Under these heightened pleading standards, a complaint alleging material misstatements or omissions must

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). Thus, while Vohs has alleged, for instance, certain dates and types of reports, he has wholly failed to "explain why [those reports] were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000) (internal quotation omitted). To allege fraud based on "information and belief," as Vohs has done, the allegation must be "accompanied by a statement of [all] facts upon which the belief is founded." *Duncan v. Pencer*, 1996 WL 19043, at *14 (S.D.N.Y.Jan.18, 1996) (quoting *Luce v. Edelstein*, 802 F.2d 49, 54 n. 1 (2d Cir.1986)). Here, Vohs has provided nothing—aside from the bald assertion that the reports were false or altered—to "support a reasonable belief as to the misleading

nature of the statement or omission." *Novak*, 216 F.3d at 314 n. 1. Vohs has therefore failed to meet the rigorous standards of the Reform Act with respect to Brooks. Because the allegations against him were the only remaining basis to assert a primary violation on the part of Stockwalk, Vohs's Section 20(a) claim fails. The Court will therefore dismiss this count against the moving Defendants.

### III. Fraudulent Misrepresentation and Civil Conspiracy

 Finally, Vohs has alleged common law claims for fraudulent misrepresentation and civil conspiracy. Defendants have moved to dismiss on the ground that these claims are preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. §§ 77p(b)-(c), 78bb(f)(1)-(2) (2000). SLUSA provides for the immediate dismissal of certain putative class actions based on state law alleging an untrue statement or omission of a material fact made in connection with the purchase or sale of a covered security. *See Dudek v. Prudential Sec., Inc.*, 295 F.3d 875, 877 & n. 1 (8th Cir.2002). Preemption under SLUSA is appropriate where a complaint "can reasonably be read as alleging a sale or purchase of a covered security made in reliance on the allegedly faulty information provided to [the plaintiff] and to putative class members by [the defendant]." *Green v. Ameritrade*, 279 F.3d 590, 598 (8th Cir. 2002).

Here, SLUSA clearly preempts Vohs's state law class action allegations. Vohs has, as he tacitly acknowledges, alleged a covered class action. The core of Vohs's fraudulent misrepresentation claim is that he purchased securities based on Defendant's misleading statements. This represents the clearest possible case for SLUSA preemption. *See Professional Management Assocs. v. KPMG*, 335 F.3d 800, 803 (8th Cir.2003) ("SLUSA applies to *any*

covered class action alleging an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security" (emphasis added).). Vohs's civil conspiracy claim fares no better, since it alleges, in essence, that Defendants conspired to fraudulently misrepresent Stockwalk's finances. Accordingly, this claim is also swept aside in SLUSA's wide preemptive swath. The Court will therefore dismiss the state law claims against the moving Defendants.

### Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED**:

1. Defendants' Motion to Dismiss (Doc. No. 26) is **GRANTED**. The Amended Complaint is **DISMISSED WITH PREJUDICE** against Defendants Eldon Miller, Todd Miller, David Johnson, and Jeffrey Houdek.[7]

2. Pursuant to Fed.R.Civ.P. 54(b), the Court determines that there is no just reason for delaying the entry of judgment on these claims. The Clerk of Court is expressly directed to enter judgment pursuant to this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**[8]

---

[7]. As noted earlier, Defendant Thomas Brooks has not joined in his co-defendants' motion.

[8]. Vohs, who has amended his complaint once already, has requested leave in his brief to do so again. To seek leave to amend, Vohs was required under Local Rule 15.1 "to file and serve a motion and attach a copy of the proposed amended pleading." *Professional Management*, 335 F.3d at 804. Instead, Vohs "merely inserted a request to file another amended complaint in its brief." *Id.* Because he has not followed the Local Rules, and because has already had two opportunities to properly plead his claims, the Court will deny that request. In any event, given the nature of the defects in the Amended Complaint, amendment would be futile. *See Wiles v. Capitol Indemnity Corp.*, 280 F.3d 868, 871 (8th Cir.2002).